**Lynda LeBOEUF, Plaintiff,**

v.

**Anne RAMSEY et al., Defendants.**

**Civ. A. No. 75–2915–K.**

United States District Court,
D. Massachusetts.

Sept. 16, 1980.

Robert J. Pleshaw, Thomas F. McKenna, Boston, Mass., for plaintiff.

Armand Fernandes, Jr., New Bedford, Mass., for defendant Pelletier.

John A. Markey, New Bedford, Mass., for defendants Ann Ramsey, Nancy Beecher, Wayne A. Budd, Richard J. Healey, Richard Linden, John Donegan.

Betty E. Waxman, Asst. Atty. Gen., Government Bureau, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

KEETON, District Judge.

### I. Introduction

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 and the Fourteenth Amendment, alleging discrimination in employment on the basis of sex. Plaintiff alleges, first, that defendants rejected her for a position on the New Bedford Police Department because of the application of a minimum height requirement and, second, that the imposition of the height requirement had a discriminatory impact on women.

The case came on for trial before the court on May 20 and 21, 1980. Arguments were heard on May 27, 1980, and the parties were allowed time to file additional memoranda. After consideration of the evidence adduced and the arguments made at trial

and the proposed findings and conclusions,[1] memoranda, and other documents submitted by the parties, the court has reached the findings and conclusions stated here.

## II. Jurisdiction

This court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331, 1343(3) and (4), and 42 U.S.C. § 2000e–5(f).

## III. Findings of Fact

### A.

Plaintiff Lynda L. LeBoeuf, now known as Lynda L. Costa, is a thirty-two year old woman who is five feet three inches tall.

Defendant John A. Markey is the Mayor of the City of New Bedford and has been since 1971. In that capacity he has the appointing authority for the Police Department.

Defendant Joseph A. Pelletier is the Chief of Police of the City of New Bedford and has been since May, 1970. In that capacity he is responsible for the supervision, control, and management of the New Bedford Police Department.

Defendants Rosalind Pool Brooker, Brian Lawler, Donald R. Poory, George Rogers, William Saltzman, Paul G. Hamel, Richard Bachand, Donald R. Nelson, Richard Hinkle, Manuel F. Neto, and Ralph J. Saulnier comprised the New Bedford City Council on or about July 1, 1975. In that capacity they reviewed all bills and requirements submitted by the Mayor. They also had power to confirm appointments of police officers submitted by the Mayor.[2]

Defendants Nancy Beecher, Wayne A. Budd, Richard J. Healey, Richard Linden, and John Donegan comprised the Massachu-setts Civil Service Commission on or about July 1, 1975. Since that time Amelia Miclette has replaced Nancy Beecher as Chairperson of the Commission.

The Director of Civil Service for the Commonwealth of Massachusetts from at least July 1, 1973 through July 1, 1975, was Edward W. Powers. On July 1, 1975, the position of Director of Civil Services was abolished and the duties of the Director were allocated to the newly created position of Personnel Administrator. On July 1, 1975, defendant Anne Ramsey assumed the duties of Personnel Administrator. The position is now held by David Marchand.[3]

### B.

Appointments to the New Bedford Police Department are subject to Massachusetts Civil Service laws, rules, regulations, and practices.

The New Bedford Police Department makes appointments from a list of eligible applicants that is certified to it by the state civil service personnel division. The certified lists at the center of this litigation were derived from a 1972 written examination for the position of police officer. Applicants' names appeared on this list in order of their scores on the test, adjusted for various statutory[4] and court-ordered[5] preferences.

On July 24, 1973, the New Bedford City Council approved Mayor Markey's establishment of a minimum height requirement for police officers of 5 feet 6 inches. At the time, a Massachusetts statute authorized

---

1. Before and at the time of trial the parties filed proposed findings of fact and conclusions of law upon which the opposing parties had indicated, by underlining, those proposed findings that were contested. Accordingly, all non-underlined proposed findings of fact contained in State Defendants' Proposed Findings and Conclusions (which city defendants indicated was a joint submission) and all proposed findings of fact contained in Plaintiff's Proposed Findings and Conclusions that were not underlined by either state defendants or city defendants may be taken as established.

2. Defendants referred to in this paragraph, together with defendants Markey and Pelletier, are hereinafter referred to collectively as the "city defendants."

3. Defendants referred to in this paragraph and the preceding paragraph are hereinafter collectively referred to as the "state defendants."

4. See, e. g., Mass.Gen.Laws c. 31, § 26, regarding veterans' preferences under current law.

5. See Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972), on remand, 365 F.Supp. 655 (D.Mass. 1973).

such action.[6] Appropriate state authorities were notified of the adoption of the height requirement. Prior Massachusetts law had also authorized imposition of a height requirement, and the City of New Bedford had first adopted a height requirement for police officers in 1972. New Bedford abolished the height requirement in November 1974.[7]

Before 1974, men and women police personnel in New Bedford held distinct positions with distinct duties, the men serving as "police officers" and the women as "policewomen." Different examinations were administered for the two positions. After February 1974 both men and women were eligible to be "police officers" and were appointed from so-called "integrated lists" derived from a common examination. Nevertheless, female police officers were not permitted to engage in street duty until January, 1977.

In the spring of 1973 New Bedford's certified list of eligible applicants for policewomen expired by operation of law. On or about that time New Bedford had an opening for at least one policewoman position and requested that the Division of Civil Service hold an open competitive examination for the position. No such examination was ever held. The city continued to seek a policewoman. It was advised that an exemption would have to be sought from the Massachusetts Commission Against Discrimination ("MCAD") since a gender-specific hiring was to be made. Such a request was submitted by letter of March 29, 1974.[8] MCAD replied by letter of May 9, 1974, authorizing New Bedford to use the certified list for policewomen already in existence for Taunton, Massachusetts.[9] This list was never certified to New Bedford by the Division of Civil Service.

The Division of Civil Service supplied New Bedford with a certified list of eligible applicants for police officer on July 30, 1974. This was an "integrated list," containing names of eligible men and women ranked in accordance with scores on the 1972 examination, adjusted for various statutory and court-ordered preferences.[10] Plaintiff's name was not contained on this list.

On August 7, 1974, Edward M. Powers, then Director of the Division of Civil Service, notified Mayor Markey that plaintiff's name inadvertently had been omitted from the list. He instructed the Mayor to insert her name after that of William Grovell and before that of John Lopes. This position was consistent with the ranking that would have been afforded to an applicant who not only had scored 93.3% on the examination (as plaintiff had) and was a non-veteran resident of New Bedford (as plaintiff was) but also was a member of a racial minority to be accorded preference under *Castro, supra* (which plaintiff was not). Plaintiff's name should have been placed on the list in a position consistent with someone who had scored 93.3% on the 1972 written examination and was a non-minority, non-veteran resident of New Bedford.

On or about February 25, 1975, the Division of Civil Service took steps to correct the erroneous ranking of plaintiff on the list and by letter instructed New Bedford to place her name below that of Robert L. Linquest and above that of James F. Camacho, Jr., both of whom had filed applications for the police officer examination that indicated that they were non-minority, non-veteran residents of New Bedford. Neither Camacho nor Linquest has been appointed a police officer in New Bedford as a result of the July 30, 1974 certification. Both Grovell and Lopes, between whose names plain-

6. Mass.St.1973, c. 351.

7. Mass.St.1974, c. 762, approved August 8, 1974 and effective November 8, 1974, abolished any height requirement for the position of police officer unless the appointing authority petitioned the appropriate state agency for such a requirement and included with the request a validation study.

8. Plaintiff's Exhibit 1.

9. Defendants' Exhibit 9.

10. See text at nn. 4 and 5, *supra*.

tiff's was originally placed, were appointed from the July 30 list.

As a result of the error in the initial placement of her name, plaintiff was interviewed in August, 1974 for the position of police officer in New Bedford. She was rejected because she failed to meet the 5 feet 6 inches height requirement. If plaintiff's name had been placed on the list in the proper position, her name would not have been reached and she would not have been interviewed for the position of police officer in August, 1974. This list has now expired. The name of the last person to be appointed from the list appears on the list above plaintiff's name. No man whose name appears below plaintiff's on the list was appointed from the list. Several women whose names appear below plaintiff's were appointed from lists derived from this list.[11]

The Division of Civil Service in compiling the list from the 1972 examination did not take account of an applicant's height. The height requirement was a local option permitted by statute, and some municipalities did not impose a height requirement. Accordingly, applicants who failed to satisfy a municipal height requirement were rejected at the time of the interview by the municipality.

Because of its continuing need for a female police officer to perform special duties, related, for example, to female prisoners, and because no woman's name appeared sufficiently high on the July 30, 1974 list to be reached in the normal course, New Bedford requested and received a special list, dated August 12, 1974, that was derived from the July 30, 1974 list but contained only the names of female applicants. Plaintiff's name appeared first on this list.

Two appointments were made from the August 12 list.[12] The appointees ranked third and fourth on the list.[13] They both were at least 5 feet 6 inches tall. Plaintiff and the woman who ranked second were both less than 5 feet 6 inches tall and were rejected because they failed to satisfy the minimum height requirement.

Plaintiff offered at trial two sets of statistics to show the differential impact of a height requirement upon women as compared to men.[14] The first set was a table entitled "Height in inches, average height and selected percentiles, by age and sex: United States, 1960–62." This table was described at trial by plaintiff's counsel as being a National Health Service Survey compiled by HEW. It is described in plaintiff's proposed findings of fact as a compilation by the National Center for Health Statistics published in a booklet entitled "Weight, Heights, and Selected Body Dimensions of Adults," U.S. 1960–62.[15] The second set of statistics was a table entitled "Average Heights and Weights, By Age and Sex: 1960–1962 and 1971–1974." At trial plaintiff's counsel described this table as coming from the same source as the first table. Defendants indicated that they did not object to the introduction of these statistics on hearsay or authentication grounds but that they did object on the ground that the statistics did not have a sufficiently close nexus to this case. Defendants' objection was overruled.

The first set of statistics contains a wealth of data relative to heights of men and women in the period 1960–1962, among which are the following:

---

11. Jeanne F. Lawrence and Shirley R. Arsenault were appointed from a special list of female applicants when plaintiff and Carol A. Sacremento were rejected for failure to meet the height requirement. These appointments are described immediately *infra*. Ms. Sacremento was appointed as a result of a settlement reached in a dispute over the failure to appoint her from the all-women list.

12. See note 11, *supra*.

13. At the time, former Mass.Gen.Laws c. 31, § 15G (now Mass.Gen.Laws c. 31, § 27) required that an appointment from a list of three or more eligible applicants willing to accept the position be made from one of the first three positions and that written explanation be given if the highest applicant on the list was not selected.

14. Plaintiff's Exhibit 12.

15. Plaintiff's Proposed Finding of Fact 26.

1. For men between the ages of 18 and 24 years:

(a) average height: 68.7 inches, or 5 feet 8.7 inches.

(b) 20th percentile [16] height: 66.5 inches, or 5 feet 6.5 inches.

2. For men between the ages of 25 and 34 years:

(a) average height: 69.1 inches, or 5 feet 9.1 inches.

(b) 20th percentile height: 66.8 inches, or 5 feet 6.8 inches.

3. For women between the ages of 18 and 24 years:

(a) average height: 63.8 inches, or 5 feet 3.8 inches.

(b) 80th percentile [17] height: 65.9 inches, or 5 feet 5.9 inches.

4. For women between the ages of 25 and 34 years:

(a) average height: 63.7 inches, or 5 feet 3.7 inches.

(b) 80th percentile height: 65.7 inches, or 5 feet 5.7 inches.

The second set of statistics repeats the average height data for the years 1960–1962 contained in the first set and also contains the following information regarding average heights for the period 1971–1974:

1. Ages 18–24 years:

(a) men: 69.7 inches, or 5 feet 9.7 inches.

(b) women: 64.3 inches, or 5 feet 4.3 inches.

2. Ages 25–34 years:

(a) men: 69.6 inches, or 5 feet 9.6 inches.

(b) women: 64.1 inches, or 5 feet 4.1 inches.

On or about September 9, 1974, plaintiff filed a charge of discrimination with MCAD, complaining of violations of the Civil Rights Act of 1964.

On or about September 16, 1974, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of violations of the Civil Rights Act of 1964.

On December 20, 1974 MCAD issued a finding of probable cause of sex discrimination against the defendants. The probable cause finding states in its conclusion:

Conclusion—the 5' 6" height requirement has a disparate impact on women and has not been shown to be job related; because she did not meet this requirement complainant was denied a position as police officer, and seven males that were below her on the certification list were appointed. The evidence therefore supports the finding of probable cause to believe that complainant was denied appointment because of her sex.

On April 1, 1975 MCAD notified New Bedford that part of its probable cause decision was based on a mistake but that nevertheless MCAD, after reviewing the evidence, reaffirmed the decision of probable cause for the following reason:

But for the height requirement the complainant would have been appointed as a police officer pursuant to the selective certification process. As a woman she has standing to challenge this height requirement as being discriminatory towards women. The evidence set forth in the September [sic] twentieth finding provides probable cause to believe that the height requirement discriminates against women and was illegal under Chapter 151B.

These probable cause findings were not introduced at trial. It appears that the mistake referred to in the April 1 communication probably related to an initial, mistaken understanding by MCAD that the initial (erroneous) placement of plaintiff's name on the July 30, 1974 list was the correct placement of her name on that list.

16. "Percentile" is "a value on a scale of one hundred that indicates the percent of a distribution that is equal to or below it." Webster's New Collegiate Dictionary (1979). For example, that the 20th percentile height for men between 18 and 24 is 66.5 inches indicates that 20% of the men in that age group are 66.5 inches tall or less.

17. In other words, 80% of the women in the age group were 65.9 inches tall or less.

EEOC has issued plaintiff a notice of right to sue.

### III. *Claim under 42 U.S.C. § 1981*

Although plaintiff's complaint asserts a violation of 42 U.S.C. § 1981,[18] it is not at all clear that she intends to press this claim, since memoranda of law filed by her at and after trial do not advert to a violation of § 1981.[19] In any event, "[t]he overwhelming weight of authority holds § 1981 not applicable to discrimination based on sex." B. Schlei and P. Grossman, *Employment Discrimination Law* 610 (1976) (see 1979 Supplement at 139). Plaintiff is not entitled to recover under 42 U.S.C. § 1981.

### IV. *Claim under 42 U.S.C. § 1983*

■ 42 U.S.C. § 1983 [20] creates a remedy but does not itself confer any substantive rights. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617–618, 99 S.Ct. 1905, 1915, 60 L.Ed.2d 508 (1979) ("one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything"); "[s]tanding alone, § 1983 clearly provides no protection for civil rights since ... § 1983 does not provide any substantive rights at all"). Typically, § 1983 has been invoked to remedy alleged violations of the Fourteenth Amendment. Recently the Supreme Court has indicated that § 1983 encompasses not just claims of constitutional violations but also claims based solely on violations of federal statutory law. *Maine v. Thiboutot*, —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

The only federal statutory provision arguably violated in this case is Title VII.[21] The decision of the Supreme Court in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), indicates by implication that a right created by Title VII cannot be the basis for a cause of action under § 1983. *Novotny* deals with an attempt to invoke 42 U.S.C. § 1985(c), like § 1983 a remedial provision creating no substantive rights, to redress an alleged violation of Title VII. Focusing on the fact that allowing a violation of Title VII to be asserted through the remedial framework of § 1985(c) would allow the claimant to bypass the critical administrative process and other detailed and specific provisions of Title VII, the Court held that deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(c). Plaintiff has no viable statutory § 1983 claim.

■ The heart of plaintiff's § 1983 claim is her assertion of a violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. To make out this claim plaintiff must show that defendants acted with discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular course

---

**18.** 42 U.S.C. § 1981 provides in relevant part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

**19.** See Plaintiff's Supplemental Memorandum of Law, filed May 20, 1980 at trial, and Plaintiff's Memorandum of Law on Damages, filed June 9, 1980 (Document 18).

**20.** 42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**21.** Plaintiff has not asserted the violation of any federal statute as the basis for her § 1983 claim. Nevertheless, it seems appropriate for the court to address this potential basis for relief. Plaintiff has asserted a violation of Title VII. If a violation is found and plaintiff could invoke § 1983 to remedy that violation, the scope of available remedies would be enhanced.

of action at least in part "because of," not merely "in spite of," its adverse effect upon an identifiable group.

*Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979). A showing of a disproportionate impact is relevant to this determination since discriminatory purpose may be inferred from the totality of the relevant facts, but standing alone, without a finding of discriminatory purpose, disproportionate impact does not establish a violation of the equal protection clause. *Washington v. Davis, supra*, at 241, 242, 96 S.Ct. at 2048; *Personnel Administrator v. Feeney, supra*, at 274, 275, 279 nn. 24, 25, 99 S.Ct. at 2293, 2294, 2296 nn. 24, 25; *see Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–268, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

In this case, based on the totality of the circumstances, the court concludes that defendants did not act with forbidden discriminatory purpose in imposing a height requirement on candidates for police officer. At the time the requirement was imposed a state statute authorized its imposition. Although the city defendants had not and have not undertaken any validation studies to establish the job-relatedness of the height requirement, the court concludes that at the time the requirement was imposed defendants believed that it was job-related and that the height requirement was not adopted "because of" its adverse effect upon women. During the period in question the city defendants were affirmatively seeking female police personnel. Although the city defendants after adopting a unitary selection procedure continued until 1977 to differentiate between male and female police officers in terms of assigned duties, plaintiff cannot establish a Fourteenth Amendment cause of action on this basis, since she was neither on the police force then nor able to establish a Fourteenth Amendment cause of action for denial of her application.

Because the court concludes that defendants did not act with forbidden discrimina-

tory purpose in imposing the height requirement, plaintiff's Fourteenth Amendment equal protection claim fails.

## V. Claim Under Title VII

### A. Nature of the Cause of Action

Title VII is the source of a legal duty regulating the conduct of certain actors. It may be helpful to view it, like 42 U.S.C. § 1983, as creating a species of liability in the nature of tort, *cf. Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), although, of course, the remedies contemplated by Title VII differ from those traditionally available in tort. *See* 42 U.S.C. § 2000e–5(g).

In the traditional tort context, a plaintiff, in order to establish a cause of action, must prove not only a violation of a legal duty to the plaintiff but also that the violation has had an impact on some legally protected interest of the plaintiff. In the language of the shorthand formulation often used to describe the elements of a cause of action for common law negligence, a plaintiff must establish: (1) duty, (2) breach of duty, (3) cause, and (4) harm. *See* W. Prosser, Torts § 30 (4th ed. 1971); Restatement (Second) of Torts § 281 (1965). The existence of the first and second elements of this formulation make the defendant's conduct negligent, or, more generally put, wrongful. The existence of the third and fourth elements make the negligent (or wrongful) conduct of the defendant actionable by the plaintiff. *See* Restatement (Second) of Torts § 281, comment *a* (1965).

This same framework can profitably be applied to analyze plaintiff's Title VII claim. In particular, the issues raised by the distinctive circumstances of the two applications of the minimum height requirement against plaintiff—once to deny her an appointment from the integrated list and once to deny her an appointment from the all-women list—are by nature closely analogous to those commonly, though not uniformly,[22] referred to in the basic law of torts as issues of legal cause.

---

**22.** Although the terminology of "proximate cause" or "legal cause" is more often used,

these issues are sometimes referred to in terms of "duty." *See, e. g.,* W. Prosser, Torts § 43, at

## B. Legal Duty and Violation

In the context of a Title VII claim, the statute itself is the source of the relevant legal duty. The nature and dimensions of that duty are fleshed out by precedents interpreting the statute. Decisions of the Supreme Court make clear that in a Title VII [23] disparate impact [24] case, to establish a prima facie case of violation of the statute,

a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Griggs v. Duke Power Co.* [401 U.S. 424], at 432 [91 S.Ct. 849, at 854, 28 L.Ed.2d 158]. If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody*, [422 U.S. 405], at 425 [95 S.Ct. 2362, at 2375, 45 L.Ed.2d 280], quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 [93 S.Ct. 1817, 1823, 36 L.Ed.2d 668].

*Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

■ Statistics offered by plaintiff establish the significantly disparate impact of a 5 feet 6 inches minimum height requirement upon women as compared to men. Generalized national statistics, such as those offered by plaintiff here, will suffice to make out a prima facie case of violation of Title VII; plaintiff was not required to adduce comparative statistics concerning actual applicants for police officer positions. *Id.*, at 330, 97 S.Ct. at 2727. Plaintiff's statistics make out a prima facie case of violation of Title VII through unlawful discrimination on the basis of sex.

Defendants do not deny that as a general proposition application of a 5 feet 6 inches minimum height requirement to a group of men and women will have a disparate impact on the women. They also do not deny that plaintiff was rejected for appointment because of the application of the height requirement to her. Rather, they argue that plaintiff suffered no discrimination as a result of the imposition of the height requirement. Their theory is twofold. With respect to the refusal to appoint plaintiff from the integrated list when her name was called, defendants assert that because plaintiff's name was located erroneously on the list and would not have been reached had it been properly located, there was no discrimination as to which plaintiff is enti-

250 (4th ed. 1971). Such use of the term "duty" is fundamentally different from the use of the term in this opinion, since it subsumes issues addressed here under the rubric of "legal cause."

**23.** The relevant substantive provision of Title VII in this case is codified at 42 U.S.C. § 2000e–2, which provides in relevant part as follows:
(a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any

way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
It may be noted that plaintiff has not named the City of New Bedford as a defendant in this action. She has, however, sued in their official capacities the persons with authority to make and approve appointments of members of the police force. These defendants in their official capacities may be taken to be "an employer" within the meaning of 42 U.S.C. § 2000e–2.

**24.** There are two basic genres of Title VII employment discrimination cases: disparate treatment cases and disparate impact cases. *See, e. g., Furnco Construction Corp. v. Waters*, 438 U.S. 567, 581–582, 98 S.Ct. 2943, 2952, 57 L.Ed.2d 957 (1978) (Marshall, J., dissenting).

tled to complain.[25] With respect to the refusal to appoint plaintiff from the all-women list, defendants assert that as a matter of law there can be no discrimination on the basis of sex involved in the choice of one woman over another from a pool comprised only of female applicants.

■ Although deserving consideration in relation to issues in this case of legal cause and of existence of remediable harm, these arguments are not persuasive in relation to the question of the existence of a violation of Title VII. Plaintiff's prima facie case of violation of the statute relative to the general discriminatory impact of the height requirement upon women remains unrebutted. City defendants did act in violation of Title VII when they applied a minimum height requirement, which requirement had a negative disparate impact on female applicants for employment in the city's police force. There remain, however, issues of legal cause and of existence of remediable harm to plaintiff.

## C. Legal Cause and Remediable Harm

As previously indicated (see Subpart A, *supra*), in order to establish a cause of action, plaintiff must prove not only a violation of a legal duty to her but also that the violation has had an impact upon some legally protected interest of hers. The second part of this formulation—that the violation has had an impact upon some legally protected interest of plaintiff's—involves related issues of legal cause and existence of remediable harm.

### (1) The Standard for Determining Legal Cause

■ Proof of legal cause is essential to the existence of a cause of action entitling plaintiff to any relief whatsoever. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285–287, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). Legal cause subsumes two elements: (1) causation in fact, traditionally expressed either as a requirement that the conduct in question be a "substantial factor" in bringing about the harm or as a requirement that the harm would not have occurred "but for" the conduct in question; *compare* Restatement (Second) of Torts § 431 (1965) *with* E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 80.18 (1977); and (2) rules limiting the scope of liability because of the manner in which the conduct has resulted in the harm.[26] *See* Restatement (Second) of Torts § 431 (1965); W. Prosser, Torts § 42 (4th ed. 1971).

In the context of the basic law of torts, two contrasting points of view have influenced the development of the doctrine of legal cause in relation to the second of these elements. One of those points of view, supported by reasoning that the scope of liability should be commensurate with the basis of liability, favors an explicit rule limiting the scope of liability for negligence to persons within the risks by reason of which defendant's conduct is determined to be negligent,[27] and if rigorously extended, favors limiting the scope of liability to results within the scope of those risks.[28] The other point of view, focusing somewhat more upon the way the injury is "connected

---

**25.** Defendants couch this argument in terms of plaintiff's lack of standing, because of no injury in fact, but their argument can also be read as an assertion that plaintiff has failed to state a claim upon which relief can be granted.

**26.** For example, a rule requiring that the harm was a natural and probable consequence of the conduct. *See* E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 80.18 (1977).

**27.** This point of view, applied to the persons-within-the-risk issue, is expressed in the majority opinion in *Palsgraf v. Long Island R. R.*, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.). The

policy foundation of this rule is stated crisply in *Sinram v. Pennsylvania R. R.*, 61 F.2d 767, 770 (2d Cir. 1932) (Learned Hand, J.):

> But so long as it is an element of imposed liability that the wrongdoer shall in some degree disregard the sufferer's interests, it can only be an anomaly, and indeed vindictive, to make him responsible to those whose interests he has not disregarded.

**28.** *See, e. g.*, Seavey, Mr. Justice Cardozo and the Law of Torts, 39 Colum.L.Rev. 20, 29–39; 52 Harv.L.Rev. 372, 381–91; 48 Yale L.J. 390, 399–409 (1939).

with the negligence" and taking into account "many considerations" of policy and practical judgment, aims to determine whether the connection is such that the injury may be said to have been proximately caused by the negligence.[29] Among these "many considerations," however, "foreseeability of the harm" (a concept very close to "result within the scope" of relevant risks) has been most prominent.[30] Thus, under each of these mainstreams of thought about legal cause, concern about whether the harm at issue is of the general type the legal rule was designed to redress is a major influence on the decision that plaintiff's harm was or was not legally caused by defendant's wrongful conduct. Moreover, this general principle of limiting the scope of liability by a standard related to the reasons for characterizing conduct as wrongful appears not only in basic tort doctrine but as well in other more specialized bodies of law.[31] It is a principle of pervasive influence.

■ Precedents relating to the scope of liability for violations of Title VII are consistent with this general principle of legal cause. Liability extends to harm that (1) was caused in fact by defendant's violation of Title VII—*see* 42 U.S.C. § 2000e–5(g), and *cf. Mt. Healthy City School District Board of Education v. Doyle, supra* (applying traditional "but for" test to a claim based on 42 U.S.C. § 1983)—and (2) was within the scope of the types of harm against which Title VII is directed. The latter limitation, as will be developed in subsection (2) below, has been derived from the manifest objectives of the statute and the mandates it expresses.

■ Before the objectives and mandates of the statute are examined, it may be useful to observe one additional point. Applying the legal cause standard to a particular case is a function ordinarily performed by the factfinder—jury or, in a nonjury case, trial judge. Only if reasonable persons, correctly understanding the legal standard, could not differ about the outcome of its application to the evidence presented in the particular case is the legal cause issue determined by the court as questions of law are determined. If reasonable persons might differ, the legal cause issue is determined by the factfinder. This determination is by nature, however, not a finding of pure fact but instead a common-sense evaluation of the evidence as measured by the applicable legal standard. *Cf.* W. Prosser, Torts § 45 (4th ed. 1971). Moreover, in whatever way one may express the standard, its application to any set of facts that produces disagreement among reasonable persons inherently involves an element of fiat that can be defended as reasonable but cannot be demonstrated by reason to have been the only possible outcome of faithful application of an authoritative rule of law to a given set of facts. Compare the opinions of Learned Hand, J., in *Sinram,* n. 27, and Andrews, J., dissenting in *Palsgraf,* n. 29, *supra.*

(2) The Scope of Legal Cause and the Scope of Available Relief in Title VII Cases

Issues concerning the existence of remediable harm are intimately related to issues of legal cause. Remediable harm in turn

---

29. *See, e. g., Palsgraf v. Long Island R. R.,* 248 N.Y. 339, 347, 162 N.E. 99, 101 (1928) (dissenting opinion of Andrews, J.); W. Prosser, Torts § 43 (4th ed. 1971).

30. "Except only the defendant's intention to produce a given result, no other consideration so affects our feeling that it is or is not just to hold him for the result of foreseeability; and no other consideration so largely influences the courts." Edgerton, Legal Cause (pt. 2), 72 U.Pa.L.Rev. 343, 352 (1924). *Cf.* W. Prosser, Torts § 43, at 258 (4th ed. 1971).

31. *E. g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful"); *A. D. M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir. 1980) (sustaining district court finding that alleged injury was not "antitrust injury" in the absence of a showing that injuries, flowing from alleged business torts, had an unreasonable effect on competition) (citing III P. Areeda & D. Turner, Antitrust Law ¶ 737 (1978); *see also* II *id.* ¶¶ 333 *et seq.*).

subsumes two subsidiary issues: (1) the existence of harm to the plaintiff; and (2) the availability of a legal remedy for that harm.[32]

In a Title VII action, by statutory directive, certain traditional legal remedies—for example, compensatory damages—are not available.[33] B. Schlei and P. Grossman, Employment Discrimination Law at 1258 (1976) (see 1979 Supplement at 338). This is at once a statement about the types of harm to which Title VII is directed and a statement about the scope of available relief, but the two are not necessarily identical. Thus, although the scope of relief does not extend to damages for the mental and emotional impact upon a plaintiff of a violation of Title VII, this does not necessarily mean that mental and emotional impact are beyond the types of harm to which Title VII is directed. It may instead mean only

that if a remedy is allowed, it must be some remedy other than an award of monetary damages. This distinction between the scope of harm to which Title VII is directed and the relief available is well illustrated by the fact that harm in the nature of lost wages may be redressed in a Title VII action through an equitable award of backpay even though that same harm is not compensable through the legal remedy of monetary damages. This aspect of the standards relating to legal cause and remediable harm will be considered further in subdivision (3) below.

### (3) Application of the Legal Standards To The Present Case

In the circumstances of this case, has plaintiff established that City defendants' violation of Title VII was a legal cause of remediable harm to her? If so, to what relief, if any, is she entitled?

**32.** In the present case plaintiff seeks declaratory relief establishing that her rights protected by Title VII have been violated. In addition, she seeks injunctive relief that would (1) restrain defendants "from taking any action which further interferes with plaintiff's right to equal employment" (Plaintiff's Complaint, p. 16); (2) require her appointment as a police officer in the City of New Bedford; (3) require the city defendants to institute "a recruitment system in which affirmative action is taken to provide an adequate remedy for the defendants' past and present discriminatory practices (id., p. 17)"; and (4) order back pay and retroactive seniority and benefits for plaintiff. Plaintiff also seeks costs and attorneys' fees.

**33.** The point of departure for determining the legal remedy to which plaintiff is entitled is 42 U.S.C. § 2000e–5(g), which provides as follows:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discrimi-

nated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

Courts addressing the issue appear to have interpreted the use of the word "intentionally" in the statute to refer not to motivation but to knowledge of consequences. See B. Schlei and P. Grossman, *Employment Discrimination Law*, 1197 at n. 2 (1976). This interpretation is in harmony with the Supreme Court's statement in *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), that Title VII is directed "to the *consequences* of employment practices, not simply the motivation." (Emphasis in original.) See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In the present case, city defendants acted with knowledge of the consequences of disparate impact of the height requirement on women and therefore "intentionally engaged in . . . an unlawful employment practice" as that phrase is used in 42 U.S.C. § 2000e–5(g) even though, as stated in Part IV, *supra*, they did not act with "discriminatory purpose" in the sense relevant to plaintiff's § 1983 claim.

On two occasions the minimum height requirement, the imposition of which violated Title VII for reasons stated in Part V–B, *supra*, was applied to deny plaintiff an appointment she would have received but for application of this requirement. Thus, a but-for causal relationship between use of the minimum height requirement and nonappointment of plaintiff is established. In both instances, however, issues of legal cause and remediable harm are presented.

### (a) Denial of Appointment from the Integrated List

When the city defendants applied the minimum height requirement to deny plaintiff an appointment from the integrated list, in competition with men as well as other women, the appointment that plaintiff would have received but for the minimum height requirement would have been an invalid appointment, since it would have been based on the erroneously high position of her name on the list due to the inadvertent error of placing her where she should have been if she had been a minority applicant. It is probable that the invalidity would have been discovered shortly after the appointment. It is also probable that the invalid appointment would have been rescinded promptly after discovery of its invalidity, though it is less clear that in the world of practical affairs plaintiff then would have had no better prospect of remaining on or being appointed to the city police force than if she had never received the invalid appointment. Thus, in this instance the application of the minimum height requirement was a but-for cause of plaintiff's being denied an *invalid* appointment, the invalidity of which probably would have become known shortly after her appointment and the practical value of which, speculative at best, would not have included a confirmed status on the city police force.

In the essentially evaluative application of the legal standards to the evidence concerning the failure to appoint plaintiff from the integrated list, the court finds that loss of the wages and benefits she would have received had she been *invalidly* appointed from the integrated list are not results within the scope of Title VII protection.

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975), makes clear that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." [34] "The *Albemarle* presumption in favor of retroactive liability can seldom be overcome, but it does not make meaningless the district courts' duty to determine that such relief is appropriate." *City of Los Angeles v. Manhart*, 435 U.S. 702, 719, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978).

■ Viewing the issue related to loss of wages and benefits resulting from the failure to receive an invalid appointment from the perspective of the *Albemarle* presumptive rule in favor of retroactive relief, the court concludes that this is not an instance in which it would be appropriate to award backpay or other retroactive relief. This claim for backpay and other retroactive relief is a claim for imposition of liability for a harm beyond the scope of the type of results against which Title VII is directed. At the time of the decision now under discussion, plaintiff would not have received a *valid* appointment even if defendants had not discriminated against women. Thus, plaintiff suffered no loss of pay that would justify an award of backpay or other retroactive relief. Also, such relief has not been shown to be necessary in this instance to coerce compliance in the future, since the city long ago ceased to impose the height requirement. Nor can it be said that denial

---

**34.** Backpay serves the first of these purposes by creating an incentive to elimination of "practices of dubious legality" beyond that present merely in the prospect of injunctive relief. *Albemarle Paper Co. v. Moody, supra,* at 417, 95 S.Ct. at 2371. The connection of backpay with the "make whole" purpose is obvious. The same purposes served by backpay awards are served by other forms of retroactive relief.

of such relief would "frustrate the central statutory [purpose] of eradicating discrimination throughout the economy," *Albemarle v. Moody Paper Co., supra,* at 421, 95 S.Ct. at 2373, by creating an incentive structure for the elimination of "practices of dubious legality," *id.,* given the existence of a state statute authorizing imposition of a height requirement at the time the height requirement was applied in this instance to plaintiff, and the then-existing stage of evolutionary development in the interpretation of Title VII.

■ These conclusions about backpay, retroactive relief, and relief aimed at coercing future compliance, however, fall short of demonstrating that plaintiff has sustained no harm at all within the types of results against which Title VII is aimed. The absence of proof that defendants' wrongful conduct caused economic harm, when she was not appointed from the integrated list because of application of the minimum height requirement, is not fatal to plaintiff's claim of actionable violation of a legally protected right. *Cf. Carey v. Piphus,* 435 U.S. 247, 266–267, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (denial of procedural due process actionable under 42 U.S.C. § 1983 for nominal damages without proof of actual injury).[35] As already noted, in Part V–B, *supra,* plaintiff was a member of a group as to which the minimum height requirement had a significant negative disparate impact. She was rejected for a position on the police force because of application of this minimum height requirement. Without doubt she suffered mentally and emotionally, if not economically, from the application of that requirement through a period of time while the requirement was in use. Even though Title VII does not create a cause of action for damages for mental and emotional impact, and even though no other statutory or decisional basis for such an award can be identified (see Parts III and IV, *supra*), the existence of such harm bears upon the question whether she has met the legal cause and remediable harm

elements of a cause of action for declaratory relief within the scope of the Declaratory Judgment Act, 28 U.S.C. § 2201, and Title VII. Even though city defendants abandoned the minimum height requirement in 1974, they have persisted, even to the present moment, in contending that no violation of plaintiff's rights under Title VII ever occurred. In this context, the court concludes that mental and emotional impact constitutes harm sufficient to establish a right to a declaratory judgment that serves, consistently with the central objective of Title VII, the function of vindication. *Cf. Carey v. Piphus, supra,* at 266–267, 98 S.Ct. at 1053 (denial of procedural due process actionable under 42 U.S.C. § 1983 for nominal damages without proof of actual injury). Plaintiff has established that the violation of Title VII by city defendants in this instance did produce a legally cognizable impact upon her for which she is at least entitled to declaratory relief setting that controversy at rest.

### (b) Denial of Appointment from the All-Women List

■ In the second instance of application of the minimum height requirement to deny plaintiff an appointment, the appointment was made from an all-women list. This application of the minimum height requirement was a but-for cause of denial of plaintiff's appointment, but only in the context of a competition among women for an appointment. It might be argued, then, that plaintiff did not suffer harm from discrimination against women. However, the only reason that application of a height requirement produces a disparate impact upon women as a class is that it produces such impact upon the subclass of women who do not meet the height requirement. Thus, the action of city defendants in this case when they applied the height requirement to the selection from the all-women list was essential to maintaining the credibility of the height requirement in a broader context. To have abandoned application of the requirement in the all-women con-

---

**35.** There are, of course, instances entirely apart from Title VII and § 1983, in which proof of economic harm is not essential to existence of

a legal remedy. *E. g., Morningstar v. Lafayette Hotel Co.,* 211 N.Y. 465, 105 N.E. 656 (1914) (Cardozo, J.).

text would have been so inconsistent with their implicit position that the height requirement was job-related that it would have undercut fatally their position with respect to application of the height requirement to the integrated list. For this reason, even though the discrimination based on the height requirement in the particular instance of its application to the all-women list was among women only, it was so intimately and integrally related to the broader use of the height requirement that the contention that it was not a cause of legally cognizable harm to plaintiff cannot be sustained. The compelling public interest manifested in the objectives of Title VII are best served by recognizing a cause of action for harm so integrally related to the defendants' use of a criterion of employment forbidden by Title VII. Accordingly, the court finds that in this instance the legal cause and remediable harm elements are satisfied not only for the reasons applying to denial of an invalid appointment from the integrated list—because of the mental and emotional harm suffered by plaintiff and because of her interest in vindication through declaratory relief—but also because but for application of the height requirement to the selection from the all-women list, plaintiff would have been on the police force under a valid appointment. The relief appropriate in this instance, therefore, may extend not only to declaratory relief but also to backpay to redress whatever pay advantage that appointment would have yielded to plaintiff. On the basis of the evidence in this case the court concludes that plaintiff has met her burden of proof to the extent of showing that it is more probable than not that she would have continued on the police force and would have received advances in pay and status no later than the time such advances were received by Jeanne Lawrence and Shirley Arsenault, who were appointed from the all-women list when plaintiff was rejected.

Weighing equities, the court denies plaintiff's claim for overtime. One factor the court has considered is the absence of bad faith on the part of the defendants. A second factor is that, though the opportunity to serve overtime is a significant incident of an appointment, any equitable claim to overtime pay is undercut by the fact that it would be pay for time not served, and in these circumstances the "net" loss after taking account of alternative use of this time, in mitigation, is speculative. A third factor is the distinctive nature of the causal relation between the defendants' conduct and the plaintiff's harm in this case.

In structuring appropriate relief this court must take into account not only the interests of the parties but also the public interest. This constellation of interests will be best served in this instance by a decree that includes the following provisions: (1) The all-women list of 1974 will be reconstituted for one appointment to the New Bedford police force; if plaintiff satisfies other legitimate appointment criteria, including a physical examination, then as the highest ranking person on the reconstituted list she will be appointed and will be placed in the status for backpay, and the status for current and future pay, that she would have occupied had she been appointed at the same time as Jeanne Lawrence and Shirley Arsenault. (2) For purposes other than pay status plaintiff's lack of the experience she would have had if she had served on the police force throughout the period since she was improperly denied appointment may be taken into account, in recognition of the public interest—for example, the public interest in assignments appropriate to her experience.

The parties will be directed to confer with respect to the drafting of the terms of an order consistent with these rulings and to submit an agreed proposal, or their respective proposals if they cannot reach agreement. The order will include a determination of the backpay award due under these rulings as well as directives regarding other conditions of the appointment, work assignments and future pay.

#### (4) The Arguments of Mootness and Lack of Standing

Defendants have argued that controversy over the 1974 violations is now moot and that plaintiff lacks standing to complain. Each of these contentions fails.

Plaintiff proved the essential elements of a cause of action in her favor. In particular, she proved that city defendants applied an unlawful minimum-height requirement to deny her an appointment and that their action was a legal cause of remediable harm to her. Once this cause of action came into being, as it did in August, 1974, it could not be destroyed by the city's abandonment of the height requirement as to the future. That later action may render moot a claim for particular forms of relief that might otherwise have been available, such as an injunction against future use of the height requirement. *Cf. County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). It did not render moot her claims for declaratory and injunctive relief with respect to the violations that had previously occurred. The cause of action for that relief had already ripened. Defendants have nevertheless persisted in contending that no violation of plaintiff's rights ever occurred. In these circumstances, even if the court had resolved the legal cause and remediable harm issues in the context of the failure to appoint plaintiff from the all-women list by concluding that plaintiff was entitled only to declaratory relief, defendants would not be in any position to assert that declaratory relief would be insubstantial or vacuous, even apart from its potential relevance to other relief such as an award of attorneys' fees (see Part V–C, *infra*). Nor can defendants' standing argument be sustained. To pursue defendants' standing argument to its logical conclusion would be to hold that the imposition of the height requirement could not be challenged in court until some woman less than 5 feet 6 inches tall scored sufficiently high on a civil service exam to be passed over on a certified list when her name was reached because of application of the height requirement. Surely this cannot

be so when the mere existence of the height requirement might be expected to discourage otherwise qualified women from taking the civil service exam because of a self-recognized inability to meet the height requirement. *Cf. Dothard v. Rawlinson, supra*, at 330, 97 S.Ct. at 2727. As a female applicant for the position of police officer, plaintiff was a member of a group as to whom the height requirement had a sufficient negative disparate impact. The injury-in-fact component of the standing requirement [36] is satisfied by her status as a member of this group, even if problems of causation pose obstacles to granting all the relief she seeks.

### (5) Plaintiff's Request for Injunctive Relief

Plaintiff's request for generalized injunctive relief restraining defendants "from taking any action which further interferes with plaintiff's right to equal employment" is not framed with sufficient particularity to avoid future disputes over its interpretation and is for that reason denied.

Plaintiff has not shown why it would be appropriate in the context of this action by an individual plaintiff to order what would appear to be classwide relief, the institution by the city defendants of an affirmative action program. Nor has plaintiff suggested how such a program, if ordered, should be structured. This request is denied.

### D. Attorney's Fees

Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), authorizes the court in a Title VII action to allow the prevailing party a reasonable attorney's fee as part of costs. "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Nadeau v.*

---

**36.** As typically formulated, the doctrine of standing has two components: (1) injury in fact and (2) zone of interests. *E. g., Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). "The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Id.*, at 152, 90 S.Ct. at 829. The second

question is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.*, at 153, 90 S.Ct. at 829. There can be no question here that plaintiff satisfies the zone-of-interest component. Defendants do not argue otherwise.

*Helgemoe,* 581 F.2d 275, 278–279 (1st Cir. 1978). The degree of a plaintiff's success will affect the amount of attorney's fees awarded, not their availability. *Id.*

 A prevailing plaintiff "ordinarily is to be awarded attorney's fees in all but special circumstances." *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S. Ct. 2024, 64 L.Ed.2d 723 (1980), quoting *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed. 2d 648 (1978). *See Albemarle Paper Co. v. Moody, supra,* at 415, 95 S.Ct. at 2370. *See also Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). No "special circumstances" have been shown here that would justify a departure from the ordinary rule of allowing an award of attorney's fees to plaintiff.

### ORDER

A hearing is scheduled for November 7, 1980, at 3:30 p. m., to address the following issues, in light of the findings and conclusions stated in this memorandum:

1. *Terms of Relief*

 (a) To what amount is plaintiff entitled as back pay?

 (b) What should be the precise nature and scope of other relief, including any directives regarding conditions of plaintiff's appointment and her status in the future in relation to pay and in relation to work assignments and other conditions of employment? Should the court, rather than attempting to fashion a detailed order regarding events that may occur during the customary probationary period for an appointee to the police force of New Bedford, retain jurisdiction during that period to resolve any controversy that may arise?

 (c) To what extent, if any, should part or all of the relief run against one or more of the state defendants as well as the city defendants?

2. *Attorney's Fees*

---

**37.** The attention of the parties is directed to *King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), and its progeny and to

(a) What would be a reasonable amount to award to plaintiff as attorney's fees? [37] Plaintiff should be prepared to offer evidence in support of any fees claimed, and defendants may offer evidence if they wish to do so. Such evidence may be offered by affidavit unless an oral evidentiary hearing is requested by one of the parties.

(b) Should all state defendants and all city defendants be required to contribute to the award of attorney's fees to plaintiff? If not, what is the basis for distinguishing among them, and what authorities support such distinction?

---

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), relative to the factors to be considered by a district court in arriving at the amount to be awarded.