**Daniel ROSS, Appellant,**

v.

**Amos REED, individually and in his official capacity as Sec. of N.C. Dept. of Correction; Ralph D. Edwards, individually and in his official capacity as Dir. of Prisons; Fletcher K. Sanders, individually and in his official capacity as Complex Administrator, Caledonia-Odom Complex; L.V. Stephenson, individually and in his official capacity as Supt. of Caledonia Corr. Inst.; L.E. Edwards, Superintendent, Halifax Corr. Inst.; Randall E. Lee, Chairman, Caledonia Disciplinary Comm., Appellees.**

No. 83–6137.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1983.

Decided Oct. 12, 1983.

Alexander Charns (Thomas F. Loflin, III, Loflin & Loflin, Durham, N.C., on brief) for appellant.

Jacob L. Safron, Sp. Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N.C., on brief), for appellees.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Plaintiff Daniel Ross, a former North Carolina prison inmate, appeals from an order of the district court directing a verdict in favor of six defendant-employees [1] of the North Carolina Department of Corrections in Ross's action against them under 42 U.S.C. § 1983. Ross alleged that during his incarceration his first amendment rights had been violated when he was disciplined under a prison regulation for writing several letters to a state employee; he further claimed he had been subjected to cruel and unusual punishment in violation of his eighth amendment rights. The district court agreed that the prison regulation had been unconstitutionally applied to Ross, but ruled that all the defendants were immune from liability for damages. The court also directed a verdict in favor of the defendants on the eighth amendment claim. Ross appeals, seeking to have the prison regulation declared facially unconstitutional and to be awarded a new trial on the cruel and unusual punishment claim. We affirm.

## I

While serving a sentence for first degree murder, Ross escaped in 1975 from the custody of the North Carolina prison system. He was on escape status for over two years until recaptured in Pennsylvania and returned to North Carolina.

Upon being returned to state custody, Ross's thoughts turned toward parole. Before his escape, Ross's parole eligibility date had been computed by state personnel to be November 30, 1978. As a collateral consequence of being absent from custody without authorization, however, his parole date was recomputed to be October 13, 1980.

Unwilling to accept that the time spent on escape would not be counted in computing his parole eligibility date, Ross undertook to change that fact. (Ross asserted a belief that, because he had not been *convicted* of escape in a state court, the two years that he was *actually* on escape should still count as time served toward completion of sentence.) In addition to several other lawsuits concerning parole practices and procedures, Ross filed a lawsuit on December 12, 1979, against Ms. Hazel Keith. Ross alleged that Ms. Keith, who was the Supervisor of Combined Records for the North Carolina Department of Corrections, had violated his constitutional rights by not crediting the two years of escape time as time served toward completion of sentence.[2]

Shortly after that lawsuit was filed, Ms. Keith received the following letter from Ross:

---

1. The six named defendants are: Amos Reed, Secretary of North Carolina Department of Corrections, accused of approving, sanctioning and authorizing the unconstitutional regulations and the unconstitutional treatment of Ross; Ralph D. Edwards, retired Director of the Division of Prisons, accused of the same acts as Reed; Fletcher K. Sanders, Administrator of Caledonia-Odom Prison Complex, charged with the same acts as Reed and also approved Ross's placement in segregation;

L.V. Stephenson, Superintendent of Caledonia, accused of same acts as Sanders; L.E. Edwards, Superintendent of Halifax, who was involved in the disciplinary actions against Ross; Randall E. Lee, Chairman of Caledonia Complex Disciplinary Committee, who was involved in the disciplinary actions against Ross.

2. The Keith lawsuit was ultimately dismissed upon Ross's failure to pay filing fees.

Dear Ms. Keith:

Since you fail to correct my prison record to reflect my original parole eligibility date to have been November 30, 1978, I am compelled to bring a lawsuit against you upon the following grounds: (1) no escape is shown in the record. (2) Because the same does not (undecipherable), you are unable to provide the court, inmate Ross, or anyone else, with a valid Judgment and Commitment of an escape conviction. (3) Erroneous information contained in inmate Ross' prison file has been and still is being relied on to a constitutionally significant degree to deny parole and other privileges, emoluments and benefits offered. (4) Inmate Ross was admitted to the N.C. prison under a Judgment and Commitment of first degree murder on March 19, 1969 with three months pre-trial credit. None other commitment is shown in record.

Apparently unwilling to rely upon the judicial process to vindicate his legal rights, Ross also started mailing a series of other letters to Ms. Keith. These letters were not addressed to Ms. Keith, but rather were addressed to North Carolina Congressman L.H. Fountain and to members of the news media. Ms. Keith was sent handwritten copies of these letters, which indicated that she was to receive a carbon copy. The text of all the letters was the same:

Re: Cruel and Unusual Punishment

Dear Congressman Fountain:

Ms. Hazell W. Keith, Director of N.C. Prison Combined Records has deliberately falsified my eligibility date for parole by programming the computer to compute escape. I have repeatedly begged her to correct this miscarry of justice by furnishing me a copy of escape judgment and commitment or compute my eligibility parole date to have been November 30, 1978. Please assist me.

Ms. Keith is a former racist supporter and has been and currently is known to accept a bribe for computerizing false and racist information in prison files for exchange of political favors. I request a prompt response.

s/Daniel Ross

cc: Ms. Hazell W. Keith
 Director of Combined Records
 831 West Morgan Street
 Raleigh, N.C. 27603

Although Ross testified that he intended to do so, he never mailed the originals of these letters to the addressees. In mailing the designated copies to Ms. Keith, however, Ross, as he later testified, was engaging in a "last ditch effort" to get credit for the time he was on escape. Ross hoped Ms. Keith would think that he had mailed the letters to the indicated addressees, and that this would pressure her into "correcting an error" in his parole eligibility.

Upon receipt of the copies of these letters, Ms. Keith, who was understandably upset, brought the letters to the attention of corrections authorities. After inquiry and investigation, Ross was convicted by a disciplinary committee of violating a prison regulation and was ultimately given the disciplinary sanction of being reduced from minimum to medium custody. Ross's internal administrative appeals of his conviction were denied.

The demotion in custody status also entailed a transfer from the minimum custody Halifax facility to the medium facility at Caledonia. About a month after this transfer, on February 21, 1980, Ross notified the assistant superintendent of Caledonia of an emergency. An inmate with whom Ross had had a previous altercation had been transferred to Caledonia, and Ross assertedly was in fear for his life. Ross requested a *transfer* out of Caledonia. The Caledonia Classification Committee met that same day and reviewed Ross's claim for protective custody. Ross was then placed in administrative segregation pending a transfer, and was kept there until he was finally transferred on May 20, 1980, to another medium custody facility.

Shortly after his final transfer, Ross filed this lawsuit alleging violations of his first and eighth amendment rights. Ross claimed that the prison regulation he was convicted under was unconstitutional on its face or at least was unconstitutionally ap-

plied to him in derogation of his free speech rights. He further claimed that his placement in administrative segregation and the conditions of his confinement therein constituted cruel and unusual punishment.

The district court ruled, on a motion for summary judgment, that the prison regulation had been unconstitutionally applied to Ross, and ordered an immediate return to minimum custody (which, as a matter of fact, had already occurred). At trial confined to the eighth amendment claim and the immunity and damages issues on the first amendment claim the court directed a verdict for the defendants on all counts. Ross then took this appeal.

## II

Ross's first contention is that the district court erred in not striking down the prison regulation as unconstitutionally overbroad and vague.[3] He seeks injunctive and declaratory relief against future enforcement of the regulation. The law does not entitle him to relief on this claim.

■ We agree with Ross initially that when overbreadth or vagueness challenges to a law are made, those challenges usually should be resolved before the validity of the law as applied is addressed. *See Hoffman Estates v. The Flipside, Hoffman Estates,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). To be stricken for overbreadth, the regulation must reach a substantial amount of constitutionally protected conduct, *Hoffman,* 455 U.S. at 494, 102 S.Ct. at 1191; and because the regulation purports to cover both speech and conduct its overbreadth is less easily established than if it covered speech alone, *see Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). The regulation in issue could only be stricken for vagueness if it is "impermissibly

vague in all of its applications," *Hoffman,* 455 U.S. at 495, 102 S.Ct. at 1191.

In order to resolve Ross's facial challenges, we would need first to look to the extent of first amendment rights had by prison inmates. Fundamentally, we know that

a prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit first amendment interests must be analyzed in terms of legitimate policies and goals of the corrections system to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). We could not tell, however, without extended inquiry, whether the state's interests in deterrence of crime, rehabilitation and internal security would justify the admittedly wide-sweeping and arguably ambiguous regulation at issue here.

■ We do not need to address Ross's claim for injunctive and declaratory relief, however, because that claim is moot. Ross has been released from state custody pursuant to a writ of habeas corpus issued by this court. *Ross v. Reed,* 704 F.2d 705 (4th Cir.1983). Accordingly, Ross does not have sufficient interest in the outcome of the requested relief to present a justiciable case or controversy.

■ To be justiciable under Article III of the Constitution, the conflict between the litigants must present a "case or controversy" both at the time the lawsuit is filed *and* at the time it is decided. If intervening factual or legal events effectively dispel the case or controversy during pendency of the

---

**3.** Ross was convicted of violating 5 NCAC 2B.0302(1), which provides:

Directing toward any state official, any member of the Prison Staff, or any member of the general public, language that is generally considered profane, contemptuous, or threatening, or by a specific gesture or act demon-

strating marked disdain, insolence, or impertinence with reference to such persons [shall constitute a major offense].

Because of our disposition of this claim on mootness grounds, we do not express any opinion of the constitutionality of this regulation.

suit, the federal courts are powerless to decide the questions presented. Ross's release has had the effect of destroying the case or controversy concerning the facial validity of the regulations.

■ Mootness of the claim for injunctive relief lies essentially in the fact that the regulation cannot now be applied to Ross, who asserts only his individual claim.[4] *See Inmates v. Owen,* 561 F.2d 560, 562 (4th Cir.1977). Similarly, the claim for declaratory relief is moot, because the release of Ross and the lack of class certification demonstrate the absence of "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). Ross himself will be unaffected by any declaration of invalidity. And the fact that Ross, asserting claims of overbreadth and vagueness, has *standing* to assert the interests of third persons does not avoid the related problem of mootness; mootness is judged by the actual interests of the litigants involved, and this is true in first amendment cases as well as others. *Golden v. Zwickler,* 394 U.S. at 109–10, 89 S.Ct. at 960–61. No federal court has jurisdiction "to pronounce any statute … void, because irreconcilable with the Constitution, *except as it is called upon to adjudge the legal rights of litigants in actual controversies."* *Liverpool, N.Y. & P.S.S. Co. v. Commissioners,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885) (emphasis added). *See also United Public Workers of America v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947).

■ In our view, Ross has no cognizable personal interest in achieving a declaration of facial invalidity. His damages claim for abrogation of his first amendment rights will not be affected; on this appeal we uphold dismissal of that claim on grounds

inapplicable to his claims for injunctive and declaratory relief. *Cf. Los Angeles v. Lyon,* ── U.S. ──, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Nor does this case meet the requirements for application of the "capable of repetition but evading review" exception to general mootness doctrine. *See, e.g., Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). First, the challenged action—application of the regulation to prison inmates—does not avoid review because of durational limits, but rather can be adequately challenged by the regular process of individualized litigation. Second, we cannot accept the contention that there is a reasonable expectation that Ross will again be subjected to the regulation. This could only occur if Ross returns to prison, but we must assume (from the legal perspective) that Ross will in the future be a law-abiding citizen. *Lyon,* ── U.S. at ── ── ──, 103 S.Ct. at 1665; *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

### III

The district court's ruling, by summary judgment, on Ross's first amendment claim was that his disciplinary demotion in custody occasioned by his letter-writing campaign violated first amendment rights. The defendants did not appeal the superfluous injunctive decree based upon this finding of violation and that finding stands unchallenged on this appeal. On trial of the remaining issues, the court ruled that the defendants were immune from liability for monetary relief under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Ross challenges the immunity ruling, contending that at the time of his demotion, defendants' acts contravened well settled law. We disagree.

All parties are agreed that the defendants—if indeed they are appropriate defendants[5]—are entitled to qualified immu-

---

4. Although Ross brought this suit as a class action, no motion for certification and no showing of the suitability of class treatment was made. The district court accordingly dismissed the class action allegations.

5. The liability of some of these defendants appears tenuous at best, because it is apparently based on some theory of *respondeat superior.* For example, Amos Reed, head of the Department of Corrections, does not appear to be tied

nity under *Fitzgerald* if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *id.* 102 S.Ct. at 2738. The question, simply put, is whether a reasonable person would have known that Ross had a clearly established constitutional right to send the particular letters in issue to Ms. Keith.

When the events at issue took place in late 1979–early 1980, the law was clear that prison authorities could not as a regular practice censor inmate mail, even if the letter unduly complains or magnifies grievances or is defamatory; rather, as was clear, censorship—and other restrictions on inmates' first amendment rights—must be justified by using narrowly drawn means to further substantial governmental interests in security, rehabilitation, and order. The proscription against run-of-the-mill censorship was first announced in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and was considered sufficiently settled by the Fifth Circuit in 1979 that a prison guard who engaged in censorship was held not entitled to qualified immunity, *McNamara v. Moody,* 606 F.2d 621 (5th Cir.1979).

Ross argues that his situation is clearly governed by *Martinez* and *Moody,* and that what happened to him was essentially censorship. The underpinning of Ross's argument, of course, is that he was engaged in activity protected by the first amendment— and the district court presumably agreed with this in its ruling on the summary judgment motion. Conversely, defendants contend that this case is a far cry from *Martinez* or *Moody;* rather, they viewed their disciplinary actions as directed at Ross's improper *conduct* in attempting to gain a benefit to which he was not entitled. Defendants argue forcefully that the activities engaged in by Ross were not clearly established first amendment rights.

■ We agree with the defendant's contention that Ross's conduct was not so clearly protected by the first amendment as to make it a "clearly established" constitutional right. In fact, we have grave reservations whether the scheme perpetrated by Ross is within the purview of the first amendment. This is not a simple case where prison officials have attempted to regulate by censorship the ordinary correspondence of inmates. It is more properly viewed as one in which the officials have attempted—though perhaps without a full and sophisticated appreciation of the implications of first amendment doctrine—to forestall and punish an arguably illegal effort to coerce official action by making allegations known to be false or unsupportable.[6]

Nevertheless, defendants have not challenged the finding of a constitutional violation on their part. Although the possibility of nevertheless exercising our supervisory jurisdiction to reconsider the issue of violation exists, and although the district court after reflection upon the implications of the intervening decision in *Harlow v. Fitzgerald* later questioned the correctness of its holding of violation,[7] we need not decide that issue. We hold instead that if, arguendo, the activity engaged in by Ross was protected by the first amendment, reasonable

directly to Ross's disciplinary action. Also, it appears that other defendants would have immunity under other theories; for example, the investigative officer, Lee, may be immune under *Segarra v. McDade,* 706 F.2d 1301 (4th Cir.1983), principles. We do not address these issues, however, because the defendants have not appealed the determination that Ross's first amendment rights were violated by the application to him of the regulation, and because we find that *Harlow v. Fitzgerald* immunity applies to bar monetary relief for that violation.

**6.** The following exchange occurred between the court and Ross:

Q. Do you have any evidence that she is a racist?
A. No, sir.
Q. All right. Do you have any that she accepted bribes?
A. No, sir.

**7.** "I have considerable question in my own mind, having heard the evidence in this case and having made both a study of the law and having now the benefit of *Harlow v. Fitzgerald,* which had not been decided at that time—I have serious question as to whether or not I would reach the same result again."

people would not have known that it was a clearly established constitutional right.[8] The facts of this case demonstrate that it is different in kind from the situations encountered in *Martinez* and *Moody*. Accordingly, we affirm the district court's judgment that all the defendants are entitled to *Harlow v. Fitzgerald* immunity.

## IV

We turn finally to Ross's claim that he was subjected to cruel and unusual punishment when he was placed in administrative segregation at the Caledonia facility.[9] This claim apparently encompasses several different strands of official conduct: Ross's placement in administrative segregation (rather than being transferred), his detention in administrative segregation for almost three months pending a transfer, and his subjection to allegedly impermissible conditions while in administrative segregation. All are claimed to amount to cruel and unusual punishment. Again, we disagree.

It is first necessary to sort out the named defendants and analyze Ross's theory of liability as it may apply to each of them. Ross's theory apparently is that all defendants found to have violated his first amendment rights are *per se* legally responsible for all events that occurred after Ross was transferred to Caledonia. It seems to come to this: but for the defendants' activities in disciplining him, he would not have been transferred to Caledonia; but for the transfer, Ross would never have been in the same facility as Willie Simmons; but for the encounter with Simmons, Ross would never have been placed in administrative segregation and suffered the allegedly unconstitutional conditions of confinement.

We first reject the more extravagant causal links between official conduct and claimed constitutional injuries that such a theory implies. The lack of a sufficient nexus between the actions of some defendants and some of the specific deprivations of right charged to them is immediately revealed and establishes as a matter of law that they cannot be held liable for any such deprivations as may have occurred. First off, the immunity that attached to the actions of the defendants who initially imposed disciplinary sanctions extends to the resulting transfer to Caledonia as a part of the sanctions. Furthermore, that act of transfer was the last act traceable to those defendants involved in the disciplinary proceedings; beyond this point any legally cognizable causal chain is severed and those defendants cannot be held legally responsible for succeeding events. Beyond this point, they cannot be said to have "deprived" Ross of any constitutional right among those claimed later to have been violated. Their conduct is simply too

---

**8.** Ross relies here heavily on the fact that his counsel, under the auspices of the ACLU, wrote a letter to L.V. Stephenson complaining of Ross's punishment. Ross claims that this letter, which is not in evidence, put the defendants on notice that they were violating Ross's rights by demoting him to medium custody. We cannot accept this contention, assuming the predicate fact is properly before us.

First, the letter was written *two months* after Ross had been transferred to Caledonia, so the defendants were not on notice at the time of the disciplinary proceedings. More important, however, is the fact that Ross's attorney's opinion of the law was not necessarily correct. Here, counsel opined that Ross's case was a pure censorship case in the mold of *Moody* and *Martinez,* but we have expressed the view that that theory is a most dubious one. We also note that the prison authorities, through their counsel and the state Attorney General's Office, reviewed the law as contained in Ross's letter; those attorneys disagreed with Ross's attorney's view of the law as it applied to Ross's situation. These different legal views indicate that, at the least, from the layman's perspective with which we are concerned, the constitutional rights claimed here were not "clearly established" at the critical time.

**9.** The issue as framed on appeal is couched strictly in eighth amendment terms and was only so argued to us on appeal. We therefore decline to address any other potential constitutional violations arising out of this placement in administrative segregation.

We also note that the basis for the district court's ruling on the eighth amendment claim is not entirely clear from the record. Because we rule as a matter of law that Ross cannot recover on this claim, we are not concerned with the confusion surrounding this claim in the record.

remote in legal contemplation to have that effect. *See Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983).

We elaborate briefly on this holding, though it may be so obvious as to require no more than its statement. Ross had been in Caledonia for approximately a month before Simmons was transferred there in what apparently was a routine inmate transfer. Ross requested to be transferred as soon as he knew Simmons had arrived on the scene. The direct causes for Ross's placement in segregation were therefore the transfer of Simmons to Caledonia, and Ross's reaction to that transfer. The causal link between the disciplinary transfer and the later encounter with Simmons is too attenuated to serve as a basis for finding the defendants who originally imposed disciplinary sanctions upon Ross liable for the still more remote consequences that followed. This means that the defendants Reed, Ralph Edwards, L.E. Edwards, and Lee—all of whom were involved only in the original disciplinary proceeding against Ross—are, as a matter of law, not liable for any of the charged violations of eighth amendment rights related to the Caledonia segregated confinement of Ross.

■ There are, however, two defendants who did have a direct link to Ross's confinement in segregation: L.V. Stephenson, Superintendent of Caledonia, and Fletcher K. Sanders, administrative head of the Caledonia-Odom prison complex.[10] Both of these men were directly involved in placing and keeping Ross in segregation for three months. Upon reviewing Ross's eighth amendment claims, however, we agree with the district court that these defendants are not liable for inflicting cruel and unusual punishment upon Ross.

Ross's first complaint—that his assignment to segregation instead of an immediate transfer constituted cruel and unusual punishment—approaches the frivolous. Ross requested an immediate transfer (to which incidentally he had no general right), but the only option immediately available to accomplish the protection he sought was to put him in protective segregation.[11] Given the duty of providing protection for Ross that arguably had been imposed upon these officers by his notification of threatened harm, *see Withers v. Levine,* 615 F.2d 158 (4th Cir.1980), their response was not only constitutionally permissible, it may have been constitutionally compelled.

■ Ross's claim that his three-month stay in segregation violated his eighth amendment rights is also without merit. The duration of an inmate's stay in segregation is not controlling on the issue of cruel and unusual punishment, *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 861 (4th Cir.1975), even when that duration is quite long. It is uncontroverted on the record that the prison officials were having a difficult time arranging for a transfer of Ross, because—for understandable reasons of record—custodians willing to take him on transfer were not easily found. As a matter of law, Ross's stay of three months in segregation—a stay occasioned by a request for protection—does not offend contemporary notions of decency and does not constitute a violation of the eighth amendment.[12] *See Rhodes v.*

---

**10.** Ross did write a letter to Reed complaining of his placement in segregation. Reed, through Ralph Edwards, referred the matter to Sanders, who was the appropriate official to handle the matter. This peripheral contact by Reed and Edwards is insufficient as a matter of law to impose liability upon them on this claim.

**11.** There is no claim that the proper procedures were not followed in placing Ross in segregation, and the defendants' evidence indicates the proper steps were taken.

**12.** Ross claims that his confinement in administrative segregation for more than 60 days constitutes cruel and unusual punishment because it violates a prison regulation. Ross points to 5 N.C.A.C. 2B.0302(e), which he claims reads as follows:

Except where the inmate is in segregation at his own request or where he is awaiting trial on serious criminal charges, no inmate is to be confined in administrative segregation more than sixty days.

We cannot accept Ross's claim. Initially, he has done a selective reading of .0302(e), which

*Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

The physical conditions of confinement Ross claims he was subjected to while in segregation[13] are little more substantial. Those claims essentially are that his room was at times extremely cold, though it is not clear how long or how often this condition is claimed to have existed; that his clothes were insufficient to keep him warm; that his cell was without light for eight weeks; and that certain of his therapeutic footwear was confiscated.[14]

The evidence on these alleged conditions was in conflict. Ross claimed he was without lights for eight weeks, but a repairman from the prison testified that he had checked all the cells in the wing where Ross was housed every day during the period in question. The purpose of this daily inspection was to make sure that the lights, plumbing and other fixtures in the cells were working properly. This repairman testified that Ross's light was never burned out and that Ross never complained about the lack of heat or lights. The repairman bolstered his testimony with records made contemporaneously with his inspections, and these records indicate that nothing was wrong in Ross's cell.

Other testimony revealed that the administrative segregation wing where Ross was housed was a brand new facility when Ross was placed there. Each inmate had a single cell with all the necessary plumbing, and the unit was centrally heated and cooled; in fact, the segregation unit was the only prison in the state that had air conditioned cells. Because the unit was centrally heated and cooled, turning the air off in one cell would require turning it off in the whole unit.

 Although this conflicting testimony might, in an appropriate case, justify sending the issue of the actual conditions in the prison to a jury, this case was appropriately taken from the jury. We cannot say what the conditions of Ross's cell were, but we can say that, on this record, defendants Stephenson and Sanders could be liable for those conditions only if the omissions of underlings are imputed to them. Because *respondeat superior* liability has no place in § 1983 jurisprudence, *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir.1977), these two defendants cannot be liable in damages to Ross on account of the conditions of the cell.

contains this proviso to which he did not advert in brief:

> If at the end of that period, the unit superintendent/institution head determines that temporary segregated confinement has not diminished the threat posed by the inmate to himself or others, he should refer the matter to the Director's Review Committee for appropriate action.

Two witnesses—Fletcher Sanders and Earl Bershears—testified that a Director's committee had met; that committee had approved on April 18 a transfer of Ross, but had also approved his continued segregation for up to six months.

The evidence, uncontradicted by Ross at trial, is that he was not kept in segregation in violation of .0302(e). Even if he had been so confined, however, his claim here would not be one for cruel and unusual punishment but for deprivation of a fourteenth amendment liberty interest—assuming, of course, that the regulations created a liberty interest in Ross. That issue is not presented here.

We develop this peripheral point in this much detail as an occasion to express our dis-

may at the pressing of this type of wholly insubstantial claim by counsel. To do so is to disserve both the justice system and litigants with at least arguably meritorious claims. And it does no countervailing service to the client of the moment. There are other examples in this appeal.

13. The only arguable questions on this claim have to do with the conditions of Ross's cell, not with the general regulations concerning inmates in administrative segregation. The fact that Ross, after being placed in segregation, had less access to the canteen, was denied "contact" visits, was handcuffed when he left his cell, etc., does not approach cruel and unusual punishment. These are restrictions placed on all segregated inmates that, though perhaps disliked, do not approach the standard of offending contemporary notions of decency.

14. This last claim is completely unsubstantiated as an eighth amendment claim and it is not advanced in any other form.

Sanders, as head of the entire Caledonia-Odom complex, was in charge of over 1500 inmates; Stephenson, superintendent of Caledonia, was in charge of 800. In these large prisons, the highest level administrators cannot be held responsible for the *individualized* complaints of every prisoner, absent knowledge, actual or constructive, of facts sufficient to put them on notice. *Layne v. Vinzant,* 657 F.2d 468, 471 n. 3 (1st Cir.1981). On this record, there is no indication that Stephenson or Sanders themselves knew or should have known of the alleged condition of Ross's cell. Sanders testified he never received complaints from any inmate concerning the temperature in the cells. There is no evidence in the record of any complaint by Ross to anyone concerning the lack of heat in his cell, nor is there sufficient evidence of complaints about the lighting to put the defendants on notice. Indeed, the defendants' employee who was in charge of the habitability of the cells testified that he examined the cell every day and found no problems; although this repairman could have been lying, or simply negligent, we cannot impute his alleged omissions to Sanders and Stephenson.

It is true, of course, that prison administrators can be liable for the poor conditions of prisons, especially if those conditions exist prison-wide. *See DiMarzo v. Cahill,* 575 F.2d 15, 17–18 (1st Cir.1978). Here, however, the record conclusively establishes that the prison was a brand new facility; any incidents of improper conditions were individualized and sporadic; no complaints were made to put Sanders and Stephenson on notice of the conditions; the facility was inspected daily by a repairman who kept records of his findings. Based on these factual predicates, we cannot say that Sanders or Stephenson should have known of the conditions endured by Ross and we accordingly affirm the district court's holding that they are not liable on Ross's eighth amendment claim.

## V

Ross's claim for injunctive and declaratory relief is moot. We affirm the holding of the district court that the defendants charged with violating Ross's first amendment rights are immune to claims for monetary relief. And we affirm the holding of the district court that none of the defendants charged with violating Ross's eighth amendment rights is liable on that claim.

AFFIRMED.