**Beresford N. SPRINGER,
Plaintiff, Appellant,**

**v.**

**Gretchen SEAMEN, et al.,
Defendants, Appellees.**

**No. 86–1809.**

United States Court of Appeals,
First Circuit.

Argued Jan. 7, 1987.

Decided June 16, 1987.

nying discovery. We affirm in part and reverse in part.

Harold L. Lichten, Portland, Me., with whom Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, Mass., was on brief, for plaintiff, appellant.

Theodore H. Kirchner, Portland, Me., for Michael Seaman.

Paula D. Silsby, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief, for Gretchen Seaman, Dorothy McGlincey and U.S. Postal Service.

Before COFFIN, Circuit Judge, ROSENN,[*] Senior Circuit Judge, and SELYA, Circuit Judge.

ROSENN, Senior Circuit Judge.

Beresford Nelson Springer (Springer), an independent contract postal carrier, alleges that the United States Postal Service (Postal Service) terminated his contract on May 21, 1985, as a result of an improper investigation instigated by the racially motivated misconduct of the individual defendants, Dorothy McGlincey, Postmaster of the Town of West Newfield; her son, Michael Seaman, a town selectman; and her daughter-in-law, Gretchen Seaman, a postal employee. Springer sued these individuals and the Postal Service for violations of 42 U.S.C. §§ 1981, 1985, 1986, and 2000d, and the fifth and fourteenth amendments. The district court granted the defendants' motion for summary judgment because it concluded that the individual defendants' actions were not the proximate cause of Springer's dismissal and that the Postal Service had not acted improperly.[1] Springer had sought to discover Postal Service documents relating to its investigatory procedure. The district court denied this motion.

Springer appeals both from the grant of summary judgment and from the order de-

## I.

Springer is a black man living in rural Maine with his wife Debra, who is white, and their three children. For over ten years, Springer worked as a contract mail carrier for the U.S. Postal Service. He had a perfect work record, and the people on his route regarded him highly, many of them signing petitions for his reinstatement and writing letters on his behalf after his contract was terminated. No one on his mail route had ever made any complaint through his long term of carrier service.

In 1981, the Postal Service discontinued its interstate carrier system. Springer was assigned to work out of the West Newfield, Maine Post Office. The new postmaster, Dorothy McGlincey, hired her daughter-in-law, Gretchen Seaman (Gretchen), as the postal clerk. McGlincey's son, Michael Seaman (Michael), was a selectman for the town, and was otherwise unemployed.

There was a great deal of evidence that these three were racially biased against Springer and that Michael Seaman wanted Springer's job for himself. After Springer's termination, Michael telephoned a postal inspector, stating that he had been instrumental in having a letter of complaint written by the board of selectmen to the postmaster general and that he was interested in getting Springer's job. Witnesses testified that Michael had stated that "he didn't like Nelson (Springer) because Nelson's a colored guy ... married to a white woman, and he don't like that. He says, 'I don't care for them salt and peppers. Let's get him out of town,'" and "the nigger in the post office has got to go." Other witnesses testified that Gretchen had called Springer a "black bastard" and had said "it's bad enough I have to work with that nigger bastard." The Springers' child testified that the Seamans' child had told him,

---

[*] Of the Third Circuit, sitting by designation.

1. Springer also brought pendent state law claims for defamation and tortious interference with a contractual relationship. Upon the grant of summary judgment for the defendants, plaintiff filed the state law claims in state court.

"My mother says black people are to be owned and not to work. Your father is stupid; black people are all stupid and that is why my mother got your father's job." Another witness testified that Gretchen had said, "I'm going to get Nelson. I'm going to get him out of this post office." Although it was not part of her job to do so, Gretchen began in 1983 to keep a secret file on Springer, apparently containing fabricated complaints and allegations.

In December 1984, Springer signed for a certified letter sent to Karen Ring, a patron on his route, who was not at home. Springer states that he understood that he had been given permission to do so by the Rings, and apparently this was true at least on a prior occasion, if not as a continuing matter. The Rings did not file a complaint; Mrs. Ring said, "I figured [it was done] for my benefit so I didn't have to go to the post office to pick up the letter." Gretchen reported the incident to Michael, who told the other selectmen about it, adding falsely that this had happened before, and that the Rings were very upset.[2]

Michael undertook to draft a letter from the selectmen to the officials of the Postal Service whose names were apparently supplied by Gretchen and McGlincey, complaining of Springer's allegedly dishonest carrying of the mail. The letter was signed by the chairman, but the initials "MS/rrj" appear in the corner. The town selectmen never contacted Springer or the Rings about the matter. Shortly thereafter, McGlincey called the Postal Service to complain about Springer, and Gretchen wrote a letter of complaint containing numerous apparently unfounded allegations including reckless driving and mishandling of mail and food stamps and suggestions of drunkenness and low character.

The Postal Service assigned the matter to Inspector R.J. Moreland. Moreland did not attempt to verify the allegations against Springer, but instead decided to test Springer's honesty with undeliverable mail containing small items of value.

On January 14, 1985, Moreland sent to McGlincey five fictitiously addressed letters containing money or redeemable coupons which McGlincey was to give to Springer to attempt to deliver. The expectation was that the letters, if not deliverable, would be returned to McGlincey, who would then return them to the Postal Service. At the time, Moreland did not know that McGlincey was related to Michael Seaman, the person who wrote the original letter of complaint, or that McGlincey was related to Gretchen Seaman, the other person who filed the complaint against Springer.

The five letters were put into Springer's delivery mail on January 15. Springer returned each of the five undeliverable letters, including those containing money, when he came back at the end of the day to the West Newfield post office, where he found two U.S. Postal Service inspectors waiting. Springer signed a waiver of his *Miranda* rights and was interrogated by the inspectors for about an hour concerning his mail delivery practices. When Springer left the post office, the five letters, the inspectors, and McGlincey were still there.

Moreland called McGlincey the next day to confirm that she was sending back the five letters that Springer had returned. He also stated that since everything was returned, he assumed that Springer was honest and the whole matter would be closed. McGlincey, however, then informed Moreland that only two of the five letters remained in the post office, and that the other three had disappeared. Indisputedly, Springer did not have a key that would give him access to the inner post office, where the letters were, once he left; McGlincey, however, did have a key to the inner office, as did Gretchen. McGlincey

2. Mrs. Ring later testified before a grand jury:
Q: Were you upset about the incident?
A. No, Nelson—all I know [is] he is the mailman, but he's always been good to us. You know, as far as he—one night he went by and called us about 2:00 o'clock in the morning and said our truck light was on, to be nice. If he signed a letter, it was just so that we didn't have to go to the post office. He knew we both worked. I didn't think he was out to do anything wrong.

remained at the post office after the inspectors and Springer left. McGlincey usually took the post office trash bag to the town dump every week. Springer's wife, Debra, and her mother were among those who habitually scavenged the West Newfield town dump, especially the weekly trash from the Postal Service, to find free coupons, free samples, magazines, offers, and so forth.

Moreland did nothing further about the Springer investigation until several months later when one of the coupons in question was returned to the Postal Service bearing the signature of Janet Perkins, Debra Springer's mother. Springer claims that Debra found this coupon in the town dump trash bag and gave it to her mother, who in turn cashed the coupon and received five dollars. In April and May several more test letters were placed in Springer's mail. One letter mailed April 8, 1985, contained a $5 bearer coupon and a return postcard offering a $3.98 pen and pencil set. The bearer coupon was sent in endorsed by Debra Springer, and the postcard was returned and filled out by the plaintiff himself.

On May 15 the inspectors returned to the West Newfield Post Office, requested that Springer sign a waiver of his *Miranda* rights, and interrogated him for over three hours. Eventually, Springer claims, the inspectors suggested that they would criminally prosecute his mother-in-law and involve his wife and children if he did not cooperate. Springer was concerned about his mother-in-law, who was ill, and also about the effect of a criminal prosecution on his son's chances for the scholarship to Dartmouth College he was seeking. Springer wrote out a confession, which he

testified had been dictated to him by the inspectors, and signed it.

The details of the investigation and the confession were forwarded to Paul Vogel, manager of the Transportation Management Office, who was the only person authorized to terminate Springer's contract. He stated that based upon Springer's signed confession and "upon the findings of an investigation conducted by the Postal Service inspection and not upon any decision or recommendation of the Postmaster of West Newfield, Maine or any other employee at that Post Office acting on her behalf," he terminated Springer's contract. A grand jury, however, reviewed the evidence and declined to indict Springer.

In 1985, Springer filed his complaint. During discovery, Springer requested production of Postal Service documents relating to rules for carrier investigations. The district court denied the request for discovery, finding that Springer had not alleged that the Postal Service or its investigatory employees were part of the alleged conspiracy, and thus the documents were irrelevant under Federal Rule of Civil Procedure 26(b). In granting summary judgment, the court reasoned that Springer's claims against the individual defendants failed for lack of a showing of proximate causation and his claims against the Postal Service failed for want of a showing of racial animus.

## II.

The district court granted summary judgment for the individual defendants[3] because it found that although "the record ... generates many disturbing issues of fact concerning alleged racial animus and other improper motivations for [their] actions," Springer had failed to show that

---

**3.** Michael Seaman's liability, if any, rests both upon his alleged abuse of his position as a selectman and upon his conspiratorial activity in his wife's and mother-in-law's alleged misconduct. In light of the conspiracy count, we reject his contention that dismissal is required for Springer's failure to allege his direct participation in the investigation. We similarly reject his assertion of qualified good faith immunity as a public official on the 1985 conspiracy claim as this is an affirmative defense and its avail-

ability would rest upon determinations whether his actions were within the scope of his official duties and whether they "violate[d] clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See also Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). As the district court has not yet addressed it, we do not consider the qualified immunity issue at this juncture.

those actions were the proximate cause [4] of his contract termination. On review of a grant of summary judgment, we may affirm only if, making all reasonable inferences in favor of the adverse party, we find that no genuine issue of material fact exists and that the movant is entitled to prevail as a matter of law. We disagree with the court's decision to grant summary judgment because we hold that proximate causation in this case was a question for the jury, not the court. Particularly in light of Springer's allegations of improprieties in the investigation,[5] we do not agree that as a matter of law the Postal Service's investigation and Vogel's decision to terminate Springer's contract were sufficiently independent of the individual defendants' actions to constitute superseding causes that would sever the proximate relationship.

The question of proximate causation is sometimes for the court and sometimes for the jury. Not only ordinary fact questions, but also "evaluative applications of legal standards (such as the legal concept of 'foreseeability') to the facts" are properly jury questions. W. Prosser & W. Keeton, *Prosser and Keeton on Torts* 320 (5th ed. 1984).[6] In any case where there might be reasonable difference of opinion as to evaluative determinations, such as a "sub-

stantial factor" determination, the question is one for the jury. *Id.* at 320–21. According to Prosser and Keeton:

> By far the greater number of cases which have arisen have been of this description; and to this extent it may properly be said that "proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case."

*Id.* at 321 (quoting *Healy v. Hoy*, 115 Minn. 321, 132 N.W. 208 (1911)). *See also Prince v. Leesona Corp.*, 720 F.2d 1166, 1169 (10th Cir.1983) ("[T]he issue of superseding cause and shifting responsibility was properly decided by the jury."); *LeBoeuf v. Ramsey*, 503 F.Supp. 747, 758 (D.Mass. 1980) ("Applying the legal cause standard to a particular case is a function ordinarily performed by the factfinder.... if reasonable persons might differ, the legal cause issue is determined by the factfinder."), *rev'd in part on other grounds sub nom. Costa v. Markey*, 677 F.2d 158 (1st Cir. 1982).

The Restatement (Second) of Torts delegates to the jury the question whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, but only where a jury may reasonably differ on that issue. § 434(2)(a). Whether

---

**4.** Causation is an implicit requirement of civil rights causes of action. *Arnold v. International Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir.1981).

**5.** The district court summarized the episode of the missing letters with a single sentence: "Plaintiff returned several of these letters to the post office." Our examination of the record assures us that this brief treatment of the issue is not indicative of Springer's failure to raise it adequately before the district court to warrant our review of the issue here.

For example, the complaint alleges that the individual defendants conspired until May of 1985, the time of the last investigation and interrogation, not merely during the time they acted to instigate the investigation. In his Memorandum Opposing Defendants' Motion for Summary Judgment, Springer noted that McGlincey and Gretchen had had access to the missing letters, and that there was substantial evidence that they, not Springer, had taken them. In his trial brief, Springer stated that he would prove

at trial that the individual defendants participated with the Postal Service in entrapping him and coercing his confession.

In his testimony before the grand jury, an excerpt of which was submitted to the district court by Springer along with his Memorandum Opposing Defendants' Motion for Summary Judgment, Postal Inspector Moreland stated that Springer brought all the test letters in that first batch back and returned them to the desk ledge in the post office. Finally, Springer also submitted a portion of his own grand jury testimony, in which he stated that after he returned the letters, he was interrogated by the inspectors, and he "would have to be insane ... after being interrogated for about a half an hour by postal inspectors to take anything out of that post office." He further stated that he spoke to the inspectors as he left and he had no key to return to the post office even if he had wanted to do so.

**6.** In many respects, principles of tort law are applicable to suits alleging violations of constitutional rights. *Clark v. Library of Congress*, 750 F.2d 89, 98 (D.C.Cir.1984).

the jury may reasonably differ is a determination left to the court. § 434(1)(a). In the present case, the district court acknowledged the existence of "actual" causation: "[I]t is plain, as Plaintiff argues, that 'but for' Defendants' actions there would likely have been no investigation," but found that the investigation was independent and therefore constituted an intervening cause sufficient to supersede the individual defendants' actions. The Restatement, however, notes that if

> the reasonable foreseeability of its being done ... is a factor in determining whether the intervening act relieves the actor from liability for his antecedent [wrongful act], and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was [wrongful] or unforeseeable, the question should be left to the jury.... [I]f the liability of the actor depends upon the wrongful character of the intervening act of the third person, the judge should, if the evidence is conflicting, leave it to the jury to find what the intervening actor did, and if there is a reasonable doubt as to whether his act, as it might be found by the jury, was or was not [wrongful], this question should also be left to them.

Restatement (Second) of Torts, § 453 comments b and c (1965). In the present case, Springer does raise the issue of the foreseeability of the investigation and its aftermath, the "intervening events," from the defendants' actions, and the district court itself noted that its decision was based on the presence of an intervening factor.

We believe that traditional tort rules for determining when an intervening cause rises to the level of a superseding cause, destroying proximate causation by the primary act and thus relieving the defendant of liability, are applicable. *See supra* n. 6. The factors to be examined are couched in the language of negligence, but apply to intentional torts as well. *Id.* at §§ 870 comment 1, 431 comment d, 442. Those factors are set forth in § 442 of the Restatement, and include (1) the type of harm brought about, (2) the extraordinariness of the intervening force under the circumstances, (3) the causal relationship between the defendant's actions and the intervening force, (4) the role of a third person, (5) the third persons' liability to the plaintiff, and (6) the wrongfulness of the third person's conduct.[7]

Springer alleges that the ultimate harm he suffered, loss of his job, was precisely the end sought by the individual defendants and was certainly foreseeable from their actions, and that the termination decision was based on an investigation which was not independent of their actions. There can be no doubt that the Seamans and McGlincey were responsible for the entire investigation. Thus at least the first three of the six listed Restatement considerations turn on disputed issues of fact; causation is precisely the heart of the dispute. The last three turn on other questions of fact drawn into dispute by Springer, who alleges impropriety in the investigation itself.

7. Section 442 provides:
Considerations Important in Determining Whether an Intervening Force is a Superseding Cause
The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

The district court noted the Ninth Circuit's decision in *Arnold v. International Business Machines Corp.*, (IBM) 637 F.2d 1350 (9th Cir.1981). In *Arnold*, Arnold's employer, IBM, requested an investigation of theft of trade secrets and supplied information to a task force composed of legal and law enforcement personnel. Arnold was arrested on a warrant supported by affidavits which included information supplied by IBM. The indictment was dismissed, and Arnold sued IBM under §§ 1983 and 1985. The district court entered summary judgment for the defendants, holding that Arnold had failed to show that IBM was the cause of his arrest, search, and indictment. The Ninth Circuit affirmed, agreeing that "but for" IBM's actions, there would have been no investigation or arrest; nevertheless, IBM's lack of control over the task force's decision-making and investigation severed the requisite causal relationship. *Id.* at 1357–58. In *Arnold*, however, the court noted that although IBM brought information concerning possible criminal activity to the authorities, there was "no evidence that IBM ever considered Arnold a suspect before it went to the authorities" or indicated any suspicion of Arnold to the task force. *Id.* at 1357. IBM was merely a good faith complaining party. The court stated specifically that

> [i]f Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force [an investigative body], and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judgment.

*Id.* at 1356–57. Nothing in the record showed that IBM had influenced or exerted any control over the Task Force's decision to investigate Arnold; the investigation was wholly independent. *Id.* at 1357.

The district court in the present case reasoned that the individual defendants similarly lacked control over the ultimate decision to terminate Springer's contract, stating that "the postal investigative division conducted a full *and independent* investigation" of Springer. (Emphasis added.) The independence of the investigation is far from clear, however. In contrast to *Arnold*, McGlincey herself, and possibly Gretchen, were involved in the investigation beyond lodging the original complaints and alleging information of criminality: McGlincey was responsible for putting the items in Springer's mail, for holding them at the post office, for returning them to the postal service, for taking the post office trash to the dump, and for initially and specifically pointing to Springer as the culprit.

We find *Clark v. Library of Congress*, 750 F.2d 89 (D.C.Cir.1984), more applicable to this case. The Library of Congress had requested the FBI to conduct an investigation of its employee, Clark, after learning of his membership in a lawful political organization, and acted unfavorably on Clark's subsequent application for full-time employment. Clark sued the Library for violation of his rights under the first amendment and for employment discrimination. The court rejected the Library's argument that the FBI alone was responsible for any unreasonable intrusion or inhibition caused by the investigation, holding that "the Library by virtue of the manner in which it induced the FBI investigation and its expectation that a full field investigation would in fact be carried out, became responsible for the full scope of the investigation." *Id.* at 98, citing Restatement (Second) of Torts §§ 303, 877.

We are unpersuaded by the defendants' attempt to distinguish *Clark* on the basis of Clark's having complained of embarrassment and inhibition caused by the investigation itself, unlike Springer. Springer's allegations do suggest improprieties in the investigation itself which in themselves could constitute actionable violations of his rights, including the circumstances of his allegedly coerced confession and the possible mishandling of the test letters by McGlincey and Gretchen.

Applying the standard set forth by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471

(1977), for first amendment based employment discrimination claims,[8] the court in *Clark* held that Clark could rely upon circumstantial evidence to meet his burden of demonstrating that his constitutionally protected association or the unlawful investigation arising from that association was a substantial or motivating factor in the Library's employment decision. 750 F.2d at 101. Analogizing to the present case, there is no dispute that the investigation of Springer was a substantial or motivating factor in the Postal Service's decision to terminate Springer's contract, and that the investigation was undertaken as a result of the individual defendants' actions, the racially discriminatory character of which is at the very least an unresolved question of material fact.

The defendants also attempt to distinguish *Clark* because the Library of Congress in *Clark* made a detailed request for the FBI investigation. There is no indication that the FBI followed the Library's instructions, however. The court did rely on "the manner in which [the Library] induced the FBI investigation" as well as its expectation that a full field investigation would be conducted. While the individual defendants here did not make any detailed request for an investigation, their alleged goal was to have Springer's contract terminated, which by necessity would require an investigation of some sort. Furthermore, the manner in which they induced the investigation, allegedly including numerous misrepresentations and manipulation of the Board of Selectmen, was at least as unacceptable as that of the Library of Congress in *Clark*.

■ In *Soto v. City of Sacramento*, 567 F.Supp. 662 (E.D.Cal.1983), the court, citing *Arnold v. IBM, supra,* and quoting the Ninth Circuit's earlier decision in *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978), aptly articulated the proximate cause standard for section 1983 actions as follows:

A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an affirmative act which he is legally required to do, that causes the deprivation of which complaint is made. [Citation omitted.] Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor know or reasonably should know would cause others to inflict the constitutional injury.

567 F.Supp. at 673–74. Springer alleges that McGlincey participated directly in the investigation. There is evidence, too, that Gretchen may also have been involved at that time; in any event, an inference can reasonably be drawn that she and Michael were acting in concert with McGlincey. Where a question of fact exists as to personal involvement of a defendant, summary judgment is inappropriate. *See Stacey v. Ford*, 554 F.Supp. 8 (N.D.Ga.1982); *Clark v. Lutcher*, 77 F.R.D. 415 (M.D.Pa. 1977).

■ In sum, we conclude that the defendants have not shown that the investigation and termination decision were sufficiently independent of the individual defendants' discriminatory actions to constitute superseding causes under the Restatement as a matter of law. The issue of causation of Springer's injuries, as to which there exist genuine issues of material fact, is one for the jury. Summary judgment therefore should not have been entered in favor of the individual defendants, McGlincey and the Seamans.

---

8. The district court in the present case applied the *Mt. Healthy* standard to the facts before it, inquiring whether racial animus was a substantial or motivating factor in the contract termination decision.

## III.

■ Springer asserted claims against the Postal Service[9] for violations of 42 U.S.C. §§ 1981, 1985, 1986, and 2000d, and the fifth amendment of the United States Constitution. The district court granted the Postal Service's motion for summary judgment because Springer did not allege that racial animus on the part of Vogel or the inspectors was a substantial or motivating factor in the decision to terminate his contract. After reviewing the amended complaint, we agree that there is an absence of allegation of racial animus on the part of Vogel or the inspectors. Springer's theory of racial conspiracy focused only on the Seamans and McGlincey, and he has not asserted that the doctrine of *respondeat superior* applies to claims under §§ 1985 and 1986. We therefore affirm the district court's dismissal of Counts II and III as against the defendant Postal Service.

■ Springer's claim under § 1981, however, is much more formidable. Section 1981 derives from the Civil Rights Act of 1866 and was intended "to eradicate *all* discrimination against blacks and to secure for them full freedom and equality in civil rights." *Mahone v. Waddle,* 564 F.2d 1018 (3d Cir.1977) (emphasis in original; footnote omitted). Racial animus is a necessary element of a claim under this section. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Although Springer does not allege racial animus on the part of the Postal Service itself, he asserts that the Postal Service may be held liable for McGlincey's and Gretchen's actions on the theory of *respondeat superior.*

The *respondeat superior* doctrine has generally been held to be inapplicable to actions brought under § 1983. *See, e.g., Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Ross v. Reed,* 719 F.2d 689 (4th Cir.1983); *Glick v. Sargent,* 696 F.2d 413 (8th Cir.1983); *Ellis v. Blum,* 643 F.2d 68 (2d Cir.1981). The Supreme Court has declined to state whether the doctrine applies to § 1981 actions. *See General Bldg. Contractors Ass'n,* 458 U.S. at 392, 102 S.Ct. at 3150. Most of the courts that have addressed the question have held that *respondeat superior* does apply to § 1981 actions against public employers.[10]

■ In *Haugabrook v. City of Chicago,* 545 F.Supp. 276 (N.D.Ill.1982), the court, citing the Supreme Court's decision in *Monell v. Department of Social Services,* noted the inapplicability of *respondeat superior* to the plaintiff's § 1983 claims, and granted the defendant City's motion for summary judgment as to those claims. The court denied the City's motion for summary judgment on the § 1981 claim, however, holding that the doctrine did apply to § 1981 because of "the substantial differences between the two statutes as indicated by their respective language, purpose, and legislative history." 545 F.Supp. at 280. Section 1983 was enacted to enforce the fourteenth amendment as part of the Civil Rights Act of 1871, whereas § 1981 was originally enacted under the thirteenth amendment as part of the Civil Rights Act of 1866 and reenacted under the fourteenth amendment as part of the Enforcement Act of May 31, 1870. As the *Monell* decision was based on the "peculiar

---

9. Prior to the creation of the United States Postal Service as an independent establishment of the executive branch of the federal government in 1970, 39 U.S.C. § 201, the Post Office Department enjoyed sovereign immunity. In creating the Postal Service, Congress empowered the Service "to sue and be sued in its official name." 39 U.S.C. § 401(1). The Supreme Court has held that such a "sue and be sued" provision constitutes a waiver of sovereign immunity. *Keifer & Keifer v. Reconstruction Fin. Corp.,* 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939). The Postal Service is also amenable to suit under 42 U.S.C. § 2000d. 39 U.S.C. § 410(b)(6).

10. *Dickerson v. City Bank & Trust Co.,* 590 F.Supp. 714 (D.Kan.1984); *Haugabrook v. City of Chicago,* 545 F.Supp. 276 (N.D.Ill.1982); *Jones v. Local 520, Int'l Union of Operating Eng'rs,* 524 F.Supp. 487 (S.D.Ill.1981); *Ganguly v. New York State Dept. of Mental Hygiene,* 511 F.Supp. 420 (S.D.N.Y.1981); *Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs,* 469 F.Supp. 329 (E.D.Pa.1978); *Croswell v. O'Hara,* 443 F.Supp. 895 (E.D.Pa.1978); *cf. EEOC v. Gaddis,* 733 F.2d 1373 (10th Cir.1984) (private employer); *Miller v. Bank of Am.,* 600 F.2d 211 (9th Cir.1979) (same). *Contra Jett v. Dallas Indep. School Dist.,* 798 F.2d 748 (5th Cir.1986).

language, purpose and legislative history" of § 1983, its rationales were, said the court, inapplicable to § 1981, "[t]he unequivocal language of [which] and its legislative history 'manifests Congress' purpose to enact sweeping legislation implementing the thirteenth amendment to abolish all the remaining badges and vestiges of the slavery system.'" 545 F.Supp. at 280 (quoting *Mahone v. Waddle*, 564 F.2d at 1030). Unlike § 1983, § 1981 contains no limitation to actions taken under color of state law, and its legislative history evidences no intention to reject the ordinarily applicable *respondeat superior* liability or to impose the strict causation requirements of § 1983. 545 F.Supp. at 281. As we agree with the analysis of the *Haugabrook* court we hold that the doctrine of *respondeat superior* is applicable to claims brought under 42 U.S.C. § 1981.

Springer produced affidavits and documentary evidence in his response to the motion for summary judgment filed by the Postal Service, McGlincey, and Gretchen which demonstrated that he had been a victim of discrimination by McGlincey and Gretchen. He alleged that they wrongfully induced the Postal Service's investigation and termination action by means of their false communications to the Postal Service, their conspiring with Michael to induce the Board of Selectmen to make other unfounded complaints, and McGlincey's (and possibly Gretchen's) alleged tampering with the test letters in the investigation itself. The alleged manifestations of blatant racial animus on the part of the individual defendants are undisputed by the causation-based defense.

■ In order to impute liability to the Postal Service for its employees' actions, however, they must have been acting within the scope of their employment. The parties disagree whether McGlincey and Gretchen were so acting. Whether an employee's actions were within the scope of his or her duties is a question of fact for the jury, unless the answer is clearly indicated. *Restatement (Second) of Agency* § 228 comment d (1958); *see, e.g., Jordan v. Medley*, 711 F.2d 211 (D.C.Cir.1983);

*Garcia v. Sam Tanksley Trucking, Inc.*, 708 F.2d 519 (10th Cir.1983); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979). In the present case, McGlincey and Gretchen made their allegedly false accusations of Springer in their capacities as Postal Service employees. The defendants themselves, including the Postal Service, have asserted that McGlincey's and Gretchen's statements to the postal authorities concerning Springer's alleged malfeasance in his job performance "were made in fulfillment of their general duty as federal employees." Memorandum in Support of Defendants Dorothy McGlincey, Gretchen Seaman, and the United States Postal Service's Motion to Dismiss or, in the Alternative, for Summary Judgment at 20–21. Moreover, McGlincey's participation in the investigation of Springer was indisputably within the scope of her duties as postmaster. Therefore, we hold that genuine issues of material fact determinative of the Postal Service's liability under the doctrine of *respondeat superior* exist and preclude summary judgment in favor of the Postal Service.

■ The Postal Service has not asserted that the doctrine of *respondeat superior* does not apply to Springer's claim under 42 U.S.C. § 2000d. We have found no case addressing the question. We do note the Supreme Court's observation that Congress intended the Postal Service to be treated similarly to other self-sustaining commercial ventures with respect to liability. *Franchise Tax Bd. of Calif. v. United States Postal Serv.*, 467 U.S. 512, 520, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984) (citing *FHA v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). Congress has specifically stated that § 2000d applies to the Postal Service. 39 U.S.C. § 410(b)(6). We therefore hold that the Postal Service was not entitled to summary judgment on Springer's § 2000d claim.

Finally, Springer alleges violation of the fifth amendment by the Postal Service under the rule of liability for damages set forth in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). A damages

remedy may not, however, be implied if Congress has "provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and [which it] viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471–72, 64 L.Ed.2d 15 (1979).

■■■ The Postal Service contends that Springer's relief for damages is under the Contract Disputes Act, 41 U.S.C. §§ 601–613, which provides a comprehensive statutory system for resolving contract claims against the federal government. *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 223 (8th Cir.1984). Springer did file an action under that Act in the United States Claims Court. *Springer v. United States*, No. 371–85C (Cl.Ct. January 15, 1987). Similarly, the racial discrimination aspect of Springer's fifth amendment claim is subsumed in his claims under 42 U.S.C. §§ 1981 and 2000d. Springer also claims, however, that the Postal Service's alleged failure to follow its own regulations and procedures with respect to the investigation of the charges against him constituted a denial of his right to due process of law. An agency's failure to follow its own regulations may in some cases constitute a denial of due process. *See, e.g., Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States v. Leahey*, 434 F.2d 7 (1st Cir.1970). We believe, however, that such remedies that are not available to Springer under the Contract Disputes Act are substantially available to him under § 1981. We therefore affirm the grant of summary judgment on Springer's fifth amendment claim.

In sum, the district court's grant of summary judgment for the Postal Service is reversed with respect to Springer's claims under 42 U.S.C. §§ 1981 and 2000d. We affirm the grant of summary judgment for the Postal Service on Springer's claims under 42 U.S.C. §§ 1985 and 1986 and the fifth amendment.

## IV.

■■■ During discovery, Springer took the deposition of Inspector Moreland, who identified certain documents relating to Postal Service rules for investigations. The district court denied Springer's request for these documents as well as others relating specifically to his investigation because it found that he had not alleged either that the investigation had been wrongfully conducted or that the Postal Service was a part of the alleged conspiracy, and thus the requested documents were irrelevant under Fed.R.Civ.P. 26(b). Springer moved for reconsideration, but did not amend the complaint, and again the district court denied his request. A district court's order denying discovery may be reversed only for abuse of discretion. *See United States v. Thuna*, 786 F.2d 437, 444 (1st Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 100, 93 L.Ed.2d 50 (1986).

The documents at issue are the Postal Service Inspection Manual, the Internal Crimes Handbook, and two internal Postal Service memoranda concerning the blind testing program. The district court, in its order denying the motion for reconsideration, based its denial of discovery on Springer's allegations with respect to the Postal Service. Springer, however, in his memorandum in opposition to the defendants' motion for *in camera* review of the materials, stated that the documents were relevant not only to his claims against the Postal Service, but also to his claims against the individual defendants. As proximate causation of his investigation and termination is the decisive issue in Springer's claims against the individual defendants, we agree with his contention, as set forth in his memorandum, that the manuals and memos are important to those claims as well as to his claims against the Postal Service.

■■■ In sum, we hold that pertinent parts of the Postal Service Inspection Manual, the Internal Crimes Handbook, and the two internal Postal Service memoranda concerning the blind testing program may well be relevant to Springer's burden of showing that the investigation and termination were the result of the individual defendants' discriminatory actions, as well as to his claims against the Postal Service.

We therefore vacate the district court's order denying this discovery and remand the matter to the district court for reconsideration of the discovery request in light of this opinion.

### V.

Accordingly, that part of the district court's grant of summary judgment as to the individual defendants on all claims and to the Postal Service with respect to the plaintiff's claims under 42 U.S.C. §§ 1981 and 2000d is reversed, and its order denying production of the Postal Service documents is vacated. We affirm the court's grant of summary judgment to the Postal Service with respect to plaintiff's claims under 42 U.S.C. §§ 1985 and 1986 and the fifth amendment. We remand for further proceedings consistent with this opinion.

Costs taxed to the defendants.